UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CLASSIC MARITIME INC., | : | |
| | : | |
| Plaintiff, | : | 24 Civ _____ |
| | : | |
| - against - | : | |
| | : | |
| GLENCORE SINGAPORE PTE LTD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **COMPLAINT**

Plaintiff, Classic Maritime Inc., ("Classic" or "Plaintiff"), by its attorneys, Tisdale & Nast Law Offices, LLC, as and for its Complaint against Defendant Glencore Singapore Pte Ltd. ("Glencore" or "Defendant") alleges, upon on information and belief, the following:

## **INTRODUCTION**

1.      Glencore, a seller of fuel to ocean going vessels, sold contaminated fuel oil to Plaintiff's vessels and more than two hundred other vessels in the Port of Singapore between January and April 2022.  In violation of applicable international regulations and quality standards, Singapore law, and the express provisions of its contract with Plaintiff, Glencore supplied fuel contaminated with organic chlorides a/k/a chlorinated organic compounds ("COCs").  COCs in marine fuel can (and did) damage Plaintiff's main and auxiliary engines causing loss of propulsion and/or loss of electrical power necessary for operation of the vessel, including steerage.  The presence of COCs in Glencore's fuel jeopardized the safety of the vessels as well as their crews, seriously risking a major marine casualty and environmental damage.

2.      Glencore supplied this defective fuel to Plaintiff's vessels knowingly or recklessly. It supplied the same defective fuel to hundreds of other vessels.  As a direct result, Plaintiff's

vessels lost operational and/or navigational power while at sea, creating potentially life-threatening conditions for the vessels' crews. In all, Plaintiff sustained millions of dollars in damage. Other vessels Glencore supplied with defective fuel at the same time sustained similar damage.

3.      Glencore knew or consciously ignored knowledge that its fuel was defective when sold. After Plaintiff's vessels and hundreds of others were supplied with the contaminated fuel and began experiencing dire operational problems caused by the defective fuel and the resulting grave safety concerns, Glencore knowingly and recklessly failed to provide those vessels with crucial information that would have prevented or significantly reduced the harm they have suffered.

## THE PARTIES

4.      Plaintiff, Classic, is an entity organized and existing under the law of the Marshall Islands law with an office c/o Dagmar SAM, 4 Avenue De La Costa MC 98000, Monaco. At all material times, Classic was the time charterer of the M/V BACON, a bulk carrier, bearing IMO Number 9639517, the M/V RANGIROA, a bulk carrier, bearing IMO Number 9634713, the M/V TAMPA, a bulk carrier, bearing IMO Number 9363027, and the M/V MARAN BRILLIANCE, a bulk carrier bearing IMO Number 93127 (hereinafter referred to collectively as "Vessels" or "Plaintiff's Vessels").

5.      As the time charterer of these vessels, Classic was obligated to supply the vessels with marine fuels which complied with the international regulations discussed hereinafter which are applicable to marine fuels and met the engine manufacturer's specifications. Any and all losses suffered as a result of the fuel's non-compliance were Classic's responsibility under each of the charter parties.

6.     Defendant Glencore is an entity organized under the laws of a foreign country with an office located at 1 Temasek Ave, Singapore 039192 and was at all material times, a supplier of fuel to ocean going vessels at ports around the world.

7.     The Defendant's parent Glencore LTD, is a corporation organized under the laws of Switzerland with a place of business at 330 Madison Ave., New York, NY 10017.

## JURISDICTION

8.     This matter falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 as Plaintiff asserts claims for breach of maritime contract and maritime tort claims, arising from the sale and supply of defective and dangerous marine fuel into the market for consumption by ocean-going vessels, and specifically to Classic for consumption by the Vessels it time chartered.  This matter also falls within the scope of Rule 9(h) of the Federal Rules of Civil Procedure.

9.     Venue is proper because Defendant's General Terms and Conditions for the Sale of Marine Fuel ("GTC") call for exclusive jurisdiction in the United States District Court for the Southern District of New York.

## FACTS COMMON TO ALL COUNTS

### A.     International Regulation and the Contract Prohibit COC Contamination in Bunkers

10.     "Bunker fuel" or "bunkers" is the name given to the fuel which powers most ocean-going vessels, the type which Glencore sells.  It is comprised of the residual product from the refining of oil during which lighter hydrocarbons are extracted.  In order to be combustible aboard ships, the residual product is mixed with lighter fuels or "cutter stock" to varying degrees so that the end product meets the vessel's specifications.

11.     On or about June 11, 2021, Classic entered into a Fixed Forward Price ("FFP") contract with Glencore for the sale of 7,000 metric tons per month for the period July 1, 2021 to March 31, 2022 of RMG 380 3.5% max sulphur fuel oil ("bunkers" or "bunker fuel") to be supplied to Classic's vessels ("stemmed") in Singapore. The FFP required that the bunkers satisfy certain internationally recognized standards or regulations, including from the International Standards Organization ("ISO") ISO 8217:2017 and The International Convention for the Prevention of Pollution from Ships ("MARPOL") Annex VI.

12.     Thereafter, on or about November 29, 2021, Classic and Glencore extended the terms of the FFP until December 31, 2022, modifying some of the quantity and price terms but confirming again that the bunkers would comply with ISO 8217:2017 and MARPOL Annex VI. The price agreed was $421.79 per metric ton.

13.     In the normal course of events, Classic would communicate with Glencore advising them in advance of the arrival of the vessel to be stemmed under the FFP. Glencore would issue a Bunker Confirmation Note confirming the details of the upcoming stem including the fact that the stem would conform to the agreed standards set out in ISO 8217:2017 and MARPOL Annex VI, including Regulation 18. Based upon these representations by Glencore, loading of the bunkers would be authorized by Classic.

14.     During a typical stem, drip samples would be collected and distributed to the parties. Although the bunkers would have already been stemmed to the vessel, either the shipowners, ship managers or charterers, like Classic, as reasonably prudent shipowners/operators/charterers, would send a sample to be tested to establish that the bunkers satisfied the general parameters of the ISO 8217:2017 specifications. By the time the test results would be received by the owners, operators or charterers, the vessel would be on route to its

destination generally many miles from Singapore and with a small quantity of previously loaded and tested bunkers on board.  This is a typical bunker stem process in the industry.

15.    Once the stem is completed, Glencore issues a Bunker Delivery Note ("BDN") confirming the quantity loaded and again confirming that the bunkers satisfy MARPOL Annex VI.

16.    ISO 8217:2017 Clause 5.1 requires that marine fuel "consist predominantly of hydrocarbons primarily derived from petroleum sources."  Tables 1 and 2 of ISO 8217:2017 set forth the basic physical criteria that the fuel must meet.  Clause 5.2 contains a further requirement that the fuel is "*free from any material at a concentration that causes the fuel to be unacceptable for use.*"  MARPOL Annex VI, Regulation 18 specifically requires that the fuel supplied to ships must be free from inorganic acids or chemical waste that could jeopardize the ship.

17.    Bunkers that contain COCs do not meet the requirements of ISO 8217:2017 or MARPOL Annex VI. The International Council on Combustion Engines ("CIMAC") explained in a report in October 2022 (the "CIMAC Report") that COCs can cause "filter clogging," "separator sludging," and damage to "the sliding surface of the fuel system components resulting in rapid corrosive damage." This type of damage violates ISO 8217: "[F]uel oil suppliers have an obligation to comply with the ISO 8217 standard in its entirety which . . . includes Clause 5," and specifically Clause 5.2 (described above), "to ensure that no unacceptable material which might cause an adverse effect to the ship's machinery enters the fuel. If proven that the fuel, as supplied, is responsible for experienced operational problems, it would point to the bunkers not having met the ISO 8217 standard." The same is true for Regulation 18 of MARPOL Annex VI.

18.    Vessel operators rely on bunker suppliers' compliance with these requirements to ensure that a vessel's fuel supply is safe to use. The International Maritime Organization ("IMO")

and industry groups have recognized that "[f]uel oil quality is a critical safety matter." As one coalition of industry groups explained, the "consequences of a ship losing power as a result of blocked fuel oil filters, fuel oil pump failure and failure of fuel oil separators or damage to the engine" can include "allision, collision or grounding." Another industry group explained that the industry has only avoided "a serious accident" by "pure luck."

19.    Contaminated fuels create "[p]articularly serious safety risks to ships and crews." The United States Coast Guard recently issued a Marine Safety Alert warning that the "failure to ensure a supply of fuel free of water and contaminants can have devastating consequences." The "standard fuel oil testing methods found in the ISO 8217 specification" may not detect all contaminants, as evidenced by prior contamination incidents "in the United States Gulf Coast region, Caribbean ports, Singapore, [and] Malaysia" where "many ships experienc[ed] engine damage." Such contamination violates Clause 5 of ISO 8217 and MARPOL Annex VI Regulation 18.

20.    For this reason, ISO 8217:2017 Annex B also requires fuel suppliers – like Glencore – to have "adequate quality assurances and management of change procedures to ensure that the resultant fuel is compliant with the requirements of Clause 5." Annex B thus places the burden on fuel suppliers to monitor and detect whether their fuel contains any harmful chemicals, such as COCs. Indeed, while "[f]uel oil purchasers are responsible for correctly specifying the fuel oil which is to be supplied," the IMO has made clear that "[i]t is the responsibility of the supplier to deliver fuel oil which is compliant with the agreed specification and statutory limits," including "that [the] fuel oil delivered" does not "jeopardize the safety of ships or adversely affect the performance of machinery."

21.     Compliance with ISO 8217 and MARPOL Annex VI is enforced through several methods. Regulation 18(7)(d) of MARPOL Annex VI obligates convention members – including Singapore – to "take action as appropriate against fuel oil suppliers that have been found to deliver fuel oil that does not comply with that stated on the bunker delivery note." (Emphasis added.) And MARPOL Annex VI Regulation 18 requires a fuel supplier to certify on the bunker delivery note that "the fuel oil supplied is in conformity with . . . regulation 18(1)." See also 40 C.F.R. § 1043.80. Moreover, individual countries and ports often have additional enforcement mechanisms. Under U.S. law, it is illegal for any person to violate any provision of MARPOL. See 33 U.S.C. § 1907; 40 C.F.R. § 1043.30(a). Similarly, MARPOL is part of Singapore's domestic law and the Maritime and Port Authority of Singapore ("MPA") requires companies to possess a valid license for bunkering activities. To hold such a license, a bunker supplier must comply with the Singapore Standard for Quality Management for Bunker Supply Chain. That standard is intended to ensure that "the quality of bunkers supplied to vessels conforms to ISO 8217." The standard obligates bunker suppliers to ensure that the bunkers do not include any added substance, chemical waste, or other non-hydrocarbon material that renders the bunkers unfit for use.

22.     Glencore, as a bunker supplier in the Port of Singapore, is subject to both the MPA licensing requirements and MARPOL Annex VI. In turn, vessel operators – like Plaintiff – rely on bunker suppliers' compliance with MARPOL Annex VI to ensure the fuel they use complies with the convention.

23.     Singapore law also requires that the bunker operator "immediately report to MPA any irregularity in any bunker operation or contravention of any provision under the terms and conditions of its bunkering license."

**B.** **Glencore was well aware of the consequences of supplying contaminated fuel.**

24. In 2018, the maritime industry experienced a rash of bunker contamination claims arising out of the use of cutter stock containing components which were not naturally found in petroleum products, and which were harmful to the ships on which they were loaded. Such bunkers could, and did, cause significant damage to vessels' engines, sometimes to a point of causing a complete engine breakdown necessitating the employment of salvors to bring the vessels safely to a port of refuge. Glencore was well acquainted with this problem. Glencore has been party to multiple lawsuits by vessel owners suffering the consequences of bunker fuel contaminated with non-petroleum products which caused damage to engine parts and occasionally complete engine breakdown. *See, e.g., KPI Bridge Oil, Inc. v. Glencore Ltd.,* 1:19-CV-02772-ER (S.D.N.Y. Mar. 28, 2019); *ADMIntermare v. Kamca Trading SA et al.,* 1:20-CV-01223-JPO (S.D.N.Y. Feb. 12, 2020); *VL8 Pool, Inc. v. Glencore Ltd.,* 1:20-CV-02053-ALC (S.D.N.Y. Mar. 6, 2020); *Centurion Bulk Pte Ltd. v. NuStar Energy Services, Inc.,* 4:19-CV-00931 (S.D. Tex. Mar. 14, 2019); *Glencore Ltd. v. Maersk Oil Trading Panama S.A and Maersk Line A/S,* Index No. 655121/2019 (N.Y. Sup. Ct. N.Y. Cty.) (declaratory judgment action); *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551993/2022 (N.Y. Sup. Ct., N.Y. Cty.); *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551840/2022 (N.Y. Sup. Ct., N.Y. Cty.); *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551089/2022 (N.Y. Sup. Ct., N.Y. Cty.); and *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 651279/2022 (N.Y. Sup. Ct., N.Y. Cty.).

25. Glencore was intimately familiar with the 2018 contaminated bunker dilemma because, according to its Complaint against Freepoint Commodities LLC, it too was the victim of the impermissible use of harmful chemicals and waste product in bunker fuel. In its Complaint,

in *Glencore Ltd. v. Freepoint Commodities LLC*, No. 653431/2019 (N.Y. Sup. Ct., N.Y. Cty.), Glencore alleged that Freepoint sourced cutter stock from chemical manufacturers and other non-petroleum industrial sources, which contained high levels of chemical components and other harmful substances that are impermissible in bunker fuel.  Glencore has alleged that Freepoint should have performed gas chromatography-mass spectrometry ("GC-MS") and Fourier transform infrared spectroscopy ("FTIR") tests to determine the presence of these unacceptable components, and that Freepoint's failure to do so constituted negligence and violated Freepoint's duty to warn and/or represented a design defect thereby supporting strict product liability cause of action.  The cost of these GCMS and FTIR tests range between $750 and $1,000.

### C. Glencore Knowingly Sold Contaminated Fuel to Plaintiff.

26.    In January 2022, Glencore purchased a quantity of bunkers to be blended and prepared for sale in Singapore. This fuel was shipped from the Port of Khor Fakkan in the United Arab Emirates by a tanker to Glencore's floating storage facilities in Tanjong Pelepas, Malaysia, where it was further blended. From there, Glencore transported the bunkers to its storage facilities in Singapore. Glencore then sold this fuel to various vessels in the Port of Singapore. Glencore also sold a portion of this fuel to PetroChina International ("PetroChina") to be supplied to vessels. Glencore and PetroChina ultimately supplied this bunker fuel to approximately 200 vessels in the Port of Singapore between January and April 2022.

27.    At each step in this process, Glencore was obligated and best positioned to ensure its fuel complied with ISO 8217:2017 and MARPOL Annex VI Regulation 18. Until the HSFO was delivered to individual vessels (or sold to PetroChina), Glencore had exclusive control over the fuel and the means and opportunity to verify that the fuel was acceptable. Annex B of ISO

8217:2017 required Glencore to have "adequate quality assurance" procedures in place during this process.

28.     After using the Glencore-supplied bunkers, numerous ships encountered severe engine issues. These ships reported sticking fuel pumps, engine performance failures, separator sludging, and filter blocking, which resulted in critical operating problems for both main and auxiliary engines.

29.     The CIMAC Report clearly documented the issues these vessels encountered.  That report noted that over 100 ships reported operational problems after using the Glencore-supplied bunker. In particular, the report explained that the contaminated fuel caused "rapid degradation of the fuel pumps and injectors." In one instance, the fuel caused newly replaced pumps and injectors to fail "[w]ithin a week."

30.     Glencore knew of these problems almost immediately after they began occurring. On information and belief, numerous vessels, including Plaintiff's vessels, began reporting engine issues to Glencore within days of the problems arising.[1] On information and belief, these vessels also sought information from Glencore as they worked to address the engine problems while at sea.

31.     By early March, industry groups began issuing alerts about Glencore's fuel. On March 1, 2022, Viswa Lab ("Viswa") – a third-party bunker testing provider – alerted the industry it had analyzed the bunkers of three ships and found COC contamination. The alert explained that "[o]ver the last few weeks [i.e., starting in mid-February] Viswa has identified 3 bunkers supplied

---

[1] Plaintiff's information and belief is based on its analysis of: (i) reports and press releases issued by the MPA relating to its investigation of the fuel contamination; (ii) industry alerts regarding the fuel contamination; (iii) publicly available news and media articles and investigations; and (iv) other pleadings in this Court with which Plaintiff's counsel is intimately familiar with; and (v) other sources. Plaintiff currently lacks access to all the facts relating to Defendant's improper conduct because much of that information lies exclusively within the possession, custody, or control of Defendant. Plaintiff expects further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

in Singapore that had high levels of organic chlorides." Viswa also explained that "[o]ne of the vessels has already reported damage to Maine Engine and Auxiliary Engine fuel pump (Wear and Seizure), damage to filter candles and has reported higher levels of sludge generation." Viswa cautioned that "Organic Chlorides in bunker fuels have been known to cause serious problems to machinery," including "fuel pumps and cylinders."

32.     The Viswa alert further disclosed that "[t]he 3 supplies were made by 2 different suppliers" – later determined to be Glencore and PetroChina. On information and belief, the affected vessels informed Glencore that testing done by Viswa had confirmed the presence of COCs in the HSFO that Glencore supplied.

33.     On March 11, 2022, Veritas Petroleum Services ("VPS") – another bunker testing company – issued a "bunker alert" stating that it had also detected chlorinated hydrocarbons in fuel samples from HSFO deliveries in Singapore. The notice explained that the "fuel deliveries were made by a couple of suppliers" and the contaminated fuel could cause "worn out fuel pumps, fuel valve problems and subsequently main- and/or auxiliary engines failing to start."   On information and belief, the affected vessels informed Glencore that testing done by VPS had confirmed the presence of organic chlorides in the HSFO that Glencore supplied.

**D.     State of Glencore's Knowledge in Early 2022.**

34.     Further, Glencore knew from complaints from numerous other vessels stemmed before the Vessels identified herein of the presence of these contaminants in the bunkers it was selling in Singapore, and Glencore knew of the presence of contaminants before any of the Vessels began to consume the fuel.   According to industry sources, the presence of organic chlorides in Glencore's bunkers began in early February, 2022.  Glencore was aware from the vessels it stemmed earlier with the contaminated bunkers that these bunkers were hazardous, yet it took no

action either to rectify the problem before stemming the Vessels, or to discontinue the sale of the hazardous bunker fuel, or even to advise its customers like Plaintiff of the potential that the bunkers they had already purchased were hazardous. Despite this knowledge, Glencore took no action to rectify the problems with the vessels it had stemmed. Glencore failed to advise the previously stemmed vessels of the significant risks those ships faced if the contaminated fuel was consumed including the Plaintiff's Vessels. Instead, Glencore continued to sell the contaminated fuel despite knowing it was contaminated, failed to discontinue the sale of the hazardous bunker fuel, and failed to notify the customers previously stemmed of the COC contamination. In fact, in the course of the stems which occurred after March 1, 2022, Glencore intentionally misrepresented to Plaintiff and others that the bunkers would comply with ISO 8217:2017 and MARPOL when it issued its Bunker Confirmations and BDNs. Glencore was also aware from reports of significant sediment problems being encountered by vessels it stemmed, presaging that COC contamination was likely. In fact, Glencore intentionally misrepresented to Plaintiff that the bunkers would comply with ISO 8217:2017 and MARPOL in the FFP, in each bunker confirmation and in the subsequently issued BDN.

35.     In addition to the laboratory alerts discussed above, before delivering the subject bunkers to Plaintiff or Plaintiff consuming them, Glencore was already aware that numerous other vessels which were experiencing difficulties arising from the contaminated bunkers which Glencore supplied to vessels in Singapore starting in early February 2022.

36.     On or about March 2, 2022, Glencore received email correspondence from Classic about another of its vessels, the M/V PINK SANDS, a vessel which Glencore stemmed on or about February 15, 2022. The PINK SANDS was experiencing operational difficulties such as engine stoppages due to the presence of sludge in the main engine. Attached to the March 2, 2022 email

was a Fuel Analysis Operational Report prepared by an industry recognized fuel analysis laboratory which noted elevated total sediment potential ("TSP") and warned that "operational difficulties may be experienced" if the bunkers are consumed.  To a knowledgeable bunker supplier aware of possible COC contamination, elevated TSP is harbinger of COC contamination.

37.    Upon information and belief, in Glencore's internal correspondence, Defendant acknowledged that during the first week of March 2022, Glencore had received numerous complaints from vessels it had recently stemmed, struggling with stuck fuel racks, injectors and fuel pumps, some of which identified even more serious engine performance issues.  Some of these complaints included lab reports identifying the presence of COCs in the samples such as and the presence of 1, 2 Di chloroethane, Telrachloroelhylene, and Tetrahydro-DCPD in the bunkers stemmed.

38.    Thereafter, on or before March 12, 2022, when MARAN BRILLANCE was stemmed, at least ten other ships previously stemmed by Glencore made similar operational complaints.  Some of these parties also provided chemical analyses showing the presence of COCs.

39.    Before it completed the stem of Plaintiff's Vessels, Defendant knew of the presence of COCs in the bunkers it was selling to customers in Singapore.

**E.    The Maritime and Port Authority of Singapore Investigates Contaminated Fuel and Glencore.**

40.    By March 14, 2022, MPA had been notified that a number of ships in the Port of Singapore were supplied with bunkers contaminated with high levels of COCs. MPA immediately contacted the relevant bunker suppliers – including Glencore – and directed them to "take necessary steps to stop supplying the affected fuel and to also inform all the ships that were supplied with the fuel to exercise caution when using it."  Plaintiff received no such cautionary communication from Glencore, despite being in regular contact with them.

41.     On April 13, 2022, MPA released its preliminary findings about the contaminated bunker fuel. It explained that its preliminary investigation revealed that Glencore supplied the contaminated fuel: "Glencore informed MPA that on receiving reports of its fuel being contaminated, Glencore proceeded to test the fuels supplied used in its blended product, and discovered that one of them that was sourced from overseas had contained about 15000 [parts per million ('ppm')] of COC." MPA explained that Glencore had been the sole source of the contaminated fuel; PetroChina's contaminated supply came from Glencore. At that time, MPA noted that approximately "80 ships have reported various issues with their fuel pumps and engines." The CIMAC Report would later reveal that "more than 100 ships reported operational problems using high sulphur residual fuels bunkered in Singapore." Later, MPA would modify its estimate to more than 200 ships.

42.     MPA issued another update on May 5, 2022. It explained that the "HSFO containing high concentrations of COC was traced back to fuel purchased by [Glencore] in January and February 2022" and had originated from the Port of Khor Fakkan in the United Arab Emirates. MPA's testing revealed that samples taken from the original tanker, Glencore's fuel blending facilities, and storage facilities all matched the samples taken from the affected ships.

43.     As a result of Glencore's reckless and willful conduct, MPA suspended Glencore's bunkering license for two months and demanded that Glencore "improve its internal procedures to ensure that prompt action is taken in future when it becomes aware of, or reasonably suspects, any irregularity in fuel quality."

44.     In its response to a Notice to Show Cause by the MPA, Defendant submitted a letter dated July 15, 2022 which (unsuccessfully) attempted to convince the MPA not to suspend Glencore's bunkering license as a result of the early 2022 Singapore contamination event. In it,

Glencore admits that "Clause 5 of the latest versions of the ISO 8217 standard makes clear that fuel should be free from any material at a concentration that causes the fuel to be unacceptable for use in accordance with Clause 1 (i.e. material not at a concentration that is harmful to personnel, jeopardizes the safety of the ship, or adversely affects the performance of the machinery)."  Thus, Glencore knew that COC contaminated bunkers violated ISO 8217:2017.

45.     After its investigation, the MPA suspended Defendant's license to sell bunkers in Singapore because Defendant continued to sell contaminated fuel to vessels in Singapore after it knew or reasonably ought to have known of the contamination.  Because Glencore already knew that customers' vessels were experiencing engine performance issues due to the bunkers it supplied, it knew that the bunkers did not comply with ISO 8217/ 2017.

46.     After its investigation of Defendant's actions in connection with 2022 Singapore bunker contamination, the MPA concluded, among other things, that "[b] between 1 and 15 March 2022, accredited fuel oil testing laboratories in Singapore called attention to the presence of COCs ["Chlorinated Organic Compounds" also known as "Organic Chlorides"] at unusually high levels in bunkers supplied in Singapore" and that "[b] by around 12 March 2022, Glencore had received complaints from several of its customers regarding engine and/or machinery issues allegedly caused by the use of its fuel oil, as well as reports of elevated levels of COCs within the fuel samples."  The MPA further concluded that "COCs are not commonly present in bunker fuel, especially at such elevated levels, thereby rendering the bunkers supplied by Glencore contaminated."  The MPA concluded "In the light of the foregoing, Glencore knew or reasonably ought to have known by around 21 March 2022 that the fuel purchased from Straits was contaminated with high levels of COCs, but nevertheless continued to supply bunkers blended with such fuel to vessels in the port of Singapore until 1 April 2022. By such conduct, Glencore

has contravened **Clause 8.131** of its Bunkering Licence (Bunker Supplier) No. 18286 ("**licence**") in that it had failed to ensure that no bunkers supplied by it were contaminated."  (emphasis in original).

47.     MPA also specifically reminded Glencore and the other licensees "to immediately report to the MPA any irregularity in any bunkering operation or contravention of any provision under the terms and conditions of their bunker supplier license."  This same Singapore licensing obligation existed when Glencore failed to immediately report the COC contamination and resulting complaints.

48.     Glencore's callous indifference to the potential catastrophic injuries and damage the use of its contaminated bunkers could cause continued, even after the MPA investigation began.  Ultimately, the MPA suspended Defendant's bunker license for doing after March 21, 2022 what it already had been doing when Plaintiff's Vessels were stemmed, and certainly before the Vessel's began to consume them, knowingly selling potentially dangerous contaminated fuel, then concealing it.

49.     At no time, even after Plaintiff advised Glencore of the engine damage and operational issues it was encountering with the Vessels did Defendant warn or advise Plaintiff about the COC contamination.  Instead, Glencore repeatedly advised Classic that any claim it pursued was subject to a $300,000 limitation of liability.

**F.     Glencore's stem of Plaintiff's Vessels and the resulting damage**

50.     On March 4 and 5, three of Plaintiff's vessels, BACON, TAMPA and RANGIROA, were stemmed by Glencore in Singapore.  The MARAN BRILLANCE was stemmed by Glencore on March 12, 2022.  The FFP price to Classic was $421.79 per metric ton, but the spot price in March 2022 was in the order of $620 per metric ton.  Classic paid Glencore more than $6.1 million

for these four stems.  According to the FFP and the Bunker Confirmation for each of the stems, Glencore warranted that the bunkers would satisfy ISO 8217:2017 as well as MARPOL Annex VI.  Moreover, by stemming the vessels within the Singapore port limits, Glencore was implicitly warranting that the bunkers and Glencore's stemming of the vessels would comport with Singapore law.

51.     Furthermore, after each stem was completed, Glencore issued a BDN certifying that the bunkers satisfied MARPOL Annex VI.

52.     As is customary, Classic sent samples drawn during each of the Vessels' stems to Veritas Petroleum Services, B.V. ("VPS"), an industry recognized laboratory for analysis.  In each instance, the VPS Specification Report confirmed the sample's compliance with the basic specifications found in Tables 1 and 2 of ISO 8217:2017.

53.     When the Vessels began consuming the Glencore bunkers, serious operational issues were experienced on board.  For instance, BACON's auxiliary engines experienced synchronization issues and starting difficulties, requiring urgent and constant attention by the engineers on board.  The contaminated fuel caused pitting damage to the engine's plungers and barrels which subsequent analysis determined was the result of the formation of hydrochloric acid.

54.     Similar problems occurred on board the TAMPA while she was enroute to Brazil. There, the main engine suction valve seized, the pump seized on the No. 1 diesel generator as did the turbocharger to the No. 2 diesel generator.  The engine components which were removed were tested and severe pitting due to the presence of hydrochloric acid was observed.

55.     On board RANGIROA, shortly after starting to consume Glencore's bunkers, the No. 3 diesel generator fuel pump failed and the No. 1 and No. 2 auxiliary engines suffered substantial power losses due to excessive leakage from the fuel oil pump.  Later, the vessel's main

engine experienced two complete shutdowns due to damaged plungers and barrels in the Nos. 2, 3, 5 and 6 cylinders.  Shutdowns such as those experienced by RANGIROA threaten the safety of the vessel and its crew and cargo as it leaves the vessel without power in the open ocean.  One such shutdown on board RANGIORA lasted over 30 hours.  These damaged components were also analyzed, and hydrochloric pitting was discovered.

56.     When these engine damages were occurring, Classic arranged for further testing of the bunker stem samples.  GCMS testing of the samples from these vessels disclosed significant quantities of COCs present in the samples.  The hydrochloric acid which pitted the engine components was formed by the COCs coming in contact with small amounts of water in the Glencore bunkers.

57.     Because the MARAN BRILLANCE stemmed on March 12, 2022, it suffered a somewhat different fate.  Since the VPS Specification Report concluded the Glencore bunkers satisfied the basic requirements of ISO 8217:2017, the vessel began consuming them.  The main engine experienced premature fouling of the heaters and coking deposits were found on the filters.  The No. 3 diesel generator experienced starting problems due to damage to the fuel oil pumps.  The plungers were found excessively worn by pitting caused by COCs present in the bunkers.

58.     At about the same time, Hyundai, the MARAN BRILLANCE engine manufacturer published an advisory to the owners of its engines entitled "Warning of Poor Quality Bunker Oil Use."  In it, Hyundai warns its customers about a recent rash of engine problems from bunkers stemmed in Singapore containing contaminates which can only be recognized by GCMS testing. [Hyundai analogized the problem to the 2018 fatty acid problem in Houston, referred to above].  In order to avoid engine trouble due to bunker quality, Hyundai urged all owners not to burn the fuel but to segregate it until it was verified as safe to use.

59.     Once the GCMS testing of the MARAN BRILLANCE bunkers confirmed the presence of excessive COCs, the Owner of the MARAN BRILLANCE refused to further consume the Glencore bunkers.  In its message to Classic, the Owner noted that in the best-case scenario, the vessel did not carry enough spare parts to carry out the repeated repairs that would be necessary due to the rapid decomposition of the parts.  "In worst case scenario, problems shall be manifested during passage that will put the safety of navigation, vessel and crew at risk.  The fact that part of the voyage will be through highly congested waters of Malacca/Singapore Strait, reinforces our view…"

60.     Under the respective charter parties, Classic is liable for the physical damage due to off-spec bunkers suffered by the vessel's engines and the costs of repairing same.

61.     With each of the Vessels, once it was determined that the Glencore bunkers were not capable of being safely consumed, more expensive oil had to be consumed, at Plaintiff's expense.  There were no ports available to discharge the contaminated bunkers.  And because the fuel tanks were occupied with the useless contaminated fuel, the vessel had to limp between small intermediate ports to load the even more expensive alternative fuel so as to complete the voyage.

62.     Once Classic became aware that the engine problems possibly related to Glencore's bunkers, Classic kept Glencore advised of the status of the problems and Classic's efforts to mitigate those losses.  Glencore repeatedly reminded Classic of its duty to mitigate its damages and the purported $300,000 limitation of Glencore's liability in its GTC.

63.     The GTC in effect at the time of stem provides that, Glencore is responsible only for "direct expenses incurred for removal and replacement" of contaminated bunkers.  Glencore advertised itself as the supplier of marine fuel around the world.  Despite the fact that the GTC does not restrict Glencore's removal and replacement obligation to one particular place or port,

Glencore insisted that it would remove and replace the contaminated fuel only in Singapore. Thus, in order to remove the contaminated fuel from the Vessels and replace it with compliant and safe fuel, Glencore insisted all Plaintiff's Vessels return to Singapore, even though Glencore knew that Classic's vessels traded worldwide and that these vessels' next ports-of-call after the Vessels were stemmed included Brazil, India and Australia.

64.     Glencore's insistence on this extra-contractual requirement of having to return to Singapore to be debunkered meant each Vessel had to divert from wherever it was in the world and hobble back to Singapore, stopping along the way in small ports to purchase extraordinarily expensive bunkers which that Vessel could safely consume until the debunkering - rebunkering operation was completed. Because the Vessels were unaware the stemmed bunkers were contaminated and dangerous, each Vessel sailed to its next port-of-call. Each day Plaintiff's Vessels sailed further from Singapore not knowing about the contamination, the greater the risk of potential catastrophe, and the greater the damages the Vessel would incur when it had to return to Singapore to debunker and rebunker.

65.     If Glencore had exercised even a scintilla of care by warning Plaintiff about the contamination of the bunkers and the need to debunker and rebunker in Singapore, millions of dollars of time and expense would have been avoided. Instead of coming clean with Classic about the contamination, Glencore only reminding Classic of its duty to mitigate its damages and of the $300,000 limitation in the GTC. Glencore intentionally withheld from Plaintiff (and the Singapore government) information about the existence of the COCs, thereby increasing Plaintiff's damages exponentially every day this information was withheld.

66.     The damages Plaintiff seeks are not the product itself, but for the physical damages suffered by the Vessels' main and auxiliary engines and associated equipment and the expenses incurred to mitigate the damages the dangerous bunkers threatened.

## COUNT ONE

### Breach of Contract Against Glencore

67.     Plaintiff incorporates the allegations made in paragraphs 1-66 as if fully stated at length herein.

68.     Classic had a valid and binding contract with Glencore which required Glencore to supply bunker fuel for Classic's Vessels that met the specifications which were agreed by the parties.

69.     In breach of that contract, Glencore failed to provide bunker fuel that met the requirements of the contract including those specifications required for marine bunker fuel under MARPOL Annex VI and ISO 8217:2017.  Furthermore, Glencore's gross negligence, intentional misrepresentations and intentional misconduct (described herein) vitiate Glencore's purported limitations of and exonerations from liability.

70.     As a result of Glencore's breach of contract, Classic has suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT TWO

### Negligence Against Glencore

71.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-66 above as if set forth fully herein.

72.     As the source and physical supplier of bunker fuel, Glencore had duties to (i) exercise the degree of care in its plan or design of products to avoid any unreasonable risk of harm

to the Vessels exposed to danger when the bunkers were used in the manner for which it was intended; and (ii) conduct reasonable investigations to identify defects in its products.

73.     The design, blending and manufacturing of the bunker fuel was in Glencore's control and, as the supplier of the bunker fuel, Glencore was in the best position to know the quality of the bunkers and any dangers posed by the presence of harmful chemicals in the bunkers.

74.     Glencore knew or should have known prior to stemming each of the Vessels that the bunkers were unsafe, defective, and dangerous.

75.     Glencore breached its duties of care in one or more of the following ways:

a.      By failing to use and exercise reasonable care, skill and diligence in its supply of bunker fuel which resulted in the bunker fuel being unsafe, defective and dangerous;

b.      By failing to investigate whether the components of the bunker fuel contained concentrations of chemicals which would render the fuel oil defective, dangerous or unsafe to use aboard the Vessels; and

c.      By disregarding warnings that would indicate to any reasonable supplier of bunker fuel that further investigation was necessary to determine whether the bunker fuel or its components were harmful and dangerous.

76.     As a direct result of Glencore's negligence and breach of duty, the Plaintiff suffered damages, in an amount to be determined, no part of which has been paid, although duly demanded.

## COUNT THREE

### Strict Products Liability
### Failure to Warn Against Glencore

77.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-66 above as if set forth fully herein.

78.     Glencore was in the business of blending and manufacturing finished fuel products for sale.

79.    As a manufacturer of fuel oil products, Glencore had a duty to warn of latent dangers resulting from foreseeable uses of its product of which it knew or should have known.

80.    Glencore was aware that the components used to blend the bunker fuel contained dangerous concentrations of harmful chemicals that were likely to cause damage to the Vessels' engines.

81.    Glencore knew or should have known that to the extent the bunker fuel contained the COCS, such contamination was likely to cause damage to the Vessels' engines thereby risking the safety of the Vessels, their crews, their cargos and the environment.

82.    Glencore failed to warn Plaintiff, the Vessels' owners and/or the Vessels themselves of the bunkers' latent dangers.

83.    As a direct, proximate and foreseeable result of Glencore's failure to warn, the bunkers stemmed by Glencore damaged the Vessels' machinery, causing the Plaintiff to suffer damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT FOUR

### Strict Products Liability
### Design Defect Against Glencore

84.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 66 above as if set forth fully herein.

85.    Glencore was in the business of blending and manufacturing bunker fuel for sale into the marine marketplace.

86.    As a manufacturer of bunker fuel, Glencore had a duty to exercise the degree of care in its plan or design of products to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which it was intended.

87.     Glencore breached this duty in that it: (i) blended components that it knew or should have known contained chemicals in concentrations sufficient to render the finished bunker fuel defective and dangerous without investigating or remediating dangers posed by the finished product; and (ii) knew or should have known of the presence of organic chlorides in its bunker fuels and notwithstanding this knowledge, failed to conduct reasonable inspections to identify defects in the components of the bunker fuel.  Glencore could and should have blended the bunker fuel using alternative components derived from petroleum manufacturing that did not contain excessive concentrations of dangerous or harmful chemicals.

88.     As a direct, proximate and foreseeable result of Glencore's breaches of these duties, Plaintiff has suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT FIVE

### Intentional Misrepresentation Against Glencore

89.     Plaintiff repeats and realleges each and every allegation set forth in  paragraphs 1-66 above as if set forth fully herein.

90.     Glencore represented to Plaintiff in its FFP, Bunker Confirmation Notes and BDNs, that the bunker fuel that would be delivered, and that were delivered, to Plaintiff's Vessels met the specifications agreed to between the Parties.  Those repeated representations were false.  Plaintiff relied on Glencore's misrepresentations and, to its detriment, allowed the off-spec fuels to be loaded aboard its Vessels.

91.     As a result of Glencore's misrepresentations, Classic has suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT SIX

### Gross Negligence and Intentional Misconduct Against Glencore

92.     Plaintiff repeats and reallges each and every allegation set forth in paragraphs 1-66 above as if set forth fully herein.

93.     Glencore, as the physical supplier of the bunker fuel purchased by the Plaintiff, had a duty to provide fuel which was not defective or harmful to and/or acceptable for use in the Vessels' machinery.

94.     In breach of that duty, Glencore delivered fuel which it knew did not satisfy the contract specifications or industry standards, and which were not acceptable for use and could not be reasonably consumed, and if consumed, could severely damage the Vessels' main and auxiliary engines, threatening the welfare of the Vessels, their crews and cargos, and the environment.

95.     Despite knowing the hazards posed by potentially contaminated fuel from its 2018 experience, Glencore failed to undertake suitable quality assurance procedures and/or satisfy its own and industry testing standards, despite knowing the drastic consequences and enormous risks their failure to do so could cause.  Further, in addition to these extreme departures from industry and Glencore's own standards, Glencore continued to supply Classic's Vessels despite being specifically advised of problems which, if properly considered by Glencore instead of dismissed, would result in their discovering of the presence of the hazardous organic chlorides.

96.     Even after learning from the Vessels just stemmed with its bunkers that serious problems were being encountered on board the Vessels when its bunkers were being consumed, Glencore took no action to investigate the source of the problems or to warn other Vessel owners or customers of the potential harm they could face consuming what Glencore should have known was defective bunkers.  Glencore willfully ignored the complaints.  Even as more complaints were

received, Glencore continued to stem unsuspecting vessels.  In response to its Customers' complaints, Glencore merely repeated its purported limitations of liability.

97.     In callous disregard of its responsibilities, Glencore made no efforts to remedy or advise Plaintiff of the non-compliant fuel and continued to supply contaminated bunker fuel to Plaintiff's Vessels and others.

98.     Glencore repeatedly misled Plaintiff by confirming the bunkers' compliance with international law knowing that, in fact, they did not comply.  Despite knowing the bunkers were contaminated, Glencore failed to immediately advise MPA and the customers of these potentially dangerous bunkers, instead risking catastrophic consequences for its clients.

99.     As a result of Glencore's grossly negligent acts and omissions, Plaintiff has suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint, failing which default judgment be entered against it in an amount to be determined;

B.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

C.     That the Plaintiff have such other, further and different relief as the Court deems just, proper and equitable.

Dated: December 18, 2024
      New York, NY

Respectfully submitted,
Attorneys for Plaintiff,

By:        /s/ Thomas L. Tisdale
Thomas L. Tisdale (TT5263)
Tisdale & Nast Law Offices, LLC
Chrysler Building
405 Lexington Ave., 26th Floor
New York, NY  10174
Tel:    212-354-0025
*ttisdale@tisdale-law.com*