HERBERT SMITH FREEHILLS
  NEW YORK LLP
        Peter J. Behmke
        Michael P. Jones
        Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel:  (917) 542-7600
Fax:  (917) 542-7601
Email:   Peter.Behmke@hsf.com
           Michael.Jones@hsf.com
           Daniel.Gomez@hsf.com

*Attorneys for Glencore Singapore Pte Ltd.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLASSIC MARITIME INC., HAIKUO SHIPPING 1621 LTD., OCEANSURF OWNERS LTD., and ERWINA SHIPPING, LTD, <br><br> Plaintiffs, <br><br> vs. <br><br> GLENCORE SINGAPORE PTE LTD., <br><br> Defendant | Case No. 1:24-cv-09741-MKV |

## GLENCORE SINGAPORE PTE LTD.'S MEMORANDUM
## OF LAW IN SUPPORT OF MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................... 1

ALLEGED FACTS AND PROCEDURAL BACKGROUND ............................................. 3

   I.  GSPL Agrees to Sell Marine Fuel to Classic ......................................................... 3

   II.  The Contractual Allocations of Risk Among the Parties ......................................... 4

   III. GSPL Tests the Fuel Before Delivery to Classic
      and Again After Receiving Notice of a Potential Issue ........................................... 6

   IV. The FAC Does Not Plead any Deviation from Industry
      Standards, Bad Faith, or Intent to Defraud or Injure Plaintiffs ............................... 8

   V.  Overview of Plaintiffs' Claims ............................................................................... 9

   VI. Alleged Damages ................................................................................................ 10

ARGUMENT ................................................................................................................ 10

   I.  The Contract Claim Should Be Dismissed (Count I) ............................................ 10

      A.     The Sole Remedy Clause Bars Classic's Claims ......................................... 10

      B.     Section 7(A) of The GTCs Bars Classic's Claims ....................................... 12

   II.  The Negligence and Strict Liability
      Claims Should Be Dismissed (Counts II–IV) ...................................................... 13

      A.     The Economic Loss Rule Bars Plaintiffs' Claims
            Because They Seek Economic and Consequential Losses ........................... 13

      B.     The Claims Should Be Dismissed Because the Supply of
            Marine Fuel and Alleged Losses Are Governed By Contract ....................... 16

   III. The Intentional Misrepresentation Claim Should Be Dismissed (Count V) ........... 19

      A.     The Fraud Claim Is Duplicative of the Contract Claim ................................ 19

      B.     The Pleaded Facts Do Not Establish an Intent to Defraud ........................... 19

   IV. The Gross Negligence Claim Should Be Dismissed (Count VI) ........................... 21

A.    The Gross Negligence Claim Does
Not Implicate an Independent Tort Duty ................................................21

B.    The Pleaded Facts Fail to Meet
the High Standard for Gross Negligence ...............................................21

CONCLUSION ..........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADMIntermare v. Kamca Trading S.A.*,
   2022 WL 845593 (S.D.N.Y. Mar. 22, 2022) ............................................................ 17

*Am. Dredging Co. v. Plaza Petroleum*,
   799 F. Supp. 1335 (E.D.N.Y. 1992) ............................................................. 13, 15

*Am. Dredging Co. v. Plaza Petroleum*,
   845 F. Supp. 91 (E.D.N.Y. 1993) .................................................................. *passim*

*Am. Petrol. & Transp., Inc. v. City of N.Y.*,
   737 F.3d 185 (2d Cir. 2013) ........................................................................ 14

*Amin Realty LLC v. K&R Constr. Corp.*,
   306 A.D.2d 230 (2d Dep't 2003) ................................................................. 16

*Anunziatta v. Orkin Exterminating Co.*,
   180 F. Supp. 2d 353 (N.D.N.Y. 2001) ........................................................ 18

*Atlas Air Inc. v. Gen. Elec. Co.*,
   16 A.D.3d 444 (2d Dep't 2005) ................................................................... 15

*Beauvoir v. Israel*,
   794 F.3d 244 (2d Cir. 2015) ......................................................................... 3

*Bellevue South Assocs. v. HRH Constr. Corp.*,
   78 N.Y.2d 282 (1991) ................................................................................. 12

*Bocre Leasing Corp. v. Gen. Motors Corp.*,
   84 N.Y.2d 685 (1995) ........................................................................... 13, 15

*Bristol-Myers Squibb v. Delta Star, Inc.*,
   206 A.D.2d 177 (4th Dep't 1994) ............................................................... 15

*Centurion Bulk Pte Ltd. v. NuStar Energy Servs., Inc.*,
   2020 WL 8368319 (S.D. Tex. Mar. 24, 2020) ........................................... 17

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ................................................................... 19, 20

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (1987) ............................................................................ *passim*

*Condoleo v. Guangzhou Jindo Container Co.*,
   427 F. Supp. 3d 316 (E.D.N.Y. 2019) ........................................................................ 23

*Curacao Oil NV v. Trafigura Pte Ltd.*,
   2020 WL 3494685 (Sup. Ct. N.Y. Cnty. Feb. 3, 2020) ............................................. 17

*D'Amico v. Waste Mgmt. of N.Y., LLC*,
   2019 WL 1332575 (W.D.N.Y. Mar. 25, 2019) ......................................................... 24

*Dorm. Auth. v. Samson Constr. Co.*,
   30 N.Y.3d 704 (2018) ............................................................................................... 17

*Duchimaza v. Niagara Bottling, LLC*,
   619 F. Supp. 3d 395 (S.D.N.Y. 2022) ...................................................................... 20

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
   476 U.S. 858 (1986) ................................................................................................. 13

*Fanok v. Carver Boat Corp., LLC*,
   576 F. Supp. 2d 404 (E.D.N.Y. 2008) ................................................................. 13, 14

*G&G Steel, Inc. v. Sea Wolf Marine Transp., LLC*,
   2008 WL 192049 (S.D.N.Y. Jan. 23, 2008) ............................................................ 14

*Goldrich v. Watkins Wellness*,
   2024 WL 1194716 (S.D.N.Y. Mar. 20, 2024) ......................................................... 14

*Hoffman v. Kashi Sales, L.L.C.*,
   646 F. Supp. 3d 550 (S.D.N.Y. 2022) ...................................................................... 20

*Howe v. Ethicon, Inc.*,
   2022 WL 2316375 (S.D.N.Y. June 27, 2022) .......................................................... 23

*Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.*,
   387 F. Supp. 2d 299 (S.D.N.Y. 2005) ................................................................. 24, 25

*Int'l Ore and Fertilizer Corp. v. SGS Control Servs., Inc.*,
   38 F.3d 1279 (2d Cir. 1994) ..................................................................................... 16

*Jacquemyns v. Spartan Mullen Et Cie, S.A.*,
   2011 WL 348452 (S.D.N.Y. Feb. 1, 2011) .............................................................. 19

*Maersk Line Ltd. v. Care*,
   271 F. Supp. 2d 818 (E.D. Va. 2003) ....................................................................... 18

*Matana v. Merkin*,
   2014 WL 426857 (S.D.N.Y. Feb. 4, 2014) .............................................................. 20

*Matter of Part 60 Put-Back Litig.*,
  36 N.Y.3d 342 (2020) ............................................................................................ 11

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  84 N.Y.2d 430 (1994) ...................................................................................... 12, 21

*Mindspirit v. Evaluserve Ltd.*,
  2016 WL 11707410 (S.D.N.Y. Sept. 26, 2016) ...................................................... 22

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*,
  930 F. Supp. 2d 532 (S.D.N.Y. 2013) ..................................................................... 22

*Neala Commc'ns LLC v. Xerox Corp.*,
  747 F. Supp. 3d 625 (W.D.N.Y. 2024) .................................................................... 12

*Negrete v. Citibank, N.A.*,
  759 F. App'x 42 (2d Cir. 2019) .............................................................................. 19

*Robins Dry Dock & Repair Co. v. Flint*,
  275 U.S. 303 (1927) .............................................................................................. 14

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
  573 F.3d 98 (2d Cir. 2009) .................................................................................... 20

*Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*,
  2023 WL 6317996 (S.D.N.Y. Sept. 28, 2023) ................................................. *passim*

*Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*,
  2024 WL 824486 (S.D.N.Y. Feb. 15, 2024) .............................................. 17, 19, 21

*Sing. Airlines, Ltd. v. Gen. Elec. Co.*,
  2020 WL 118734 (Sup. Ct. N.Y. Cnty. Dec. 30, 2019) ..................................... 17, 18

*Tevdorachvili v. Chase Manhattan Bank*,
  103 F. Supp. 2d 632 (E.D.N.Y. 2000) ..................................................................... 24

*VL8 Pool, Inc. v. Glencore Ltd.*,
  2021 WL 1152936 (S.D.N.Y. Mar. 25, 2021) ................................................... *passim*

*VL8 Pool, Inc. v. Glencore Ltd.*,
  2021 WL 6113981 (S.D.N.Y. Dec. 27, 2021) ............................................. 22, 23, 24

*Weiss v. Polymer Plastics Corp.*,
  21 A.D.3d 1095 (2d Dep't 2005) ........................................................................... 15

*Xerox Corp. v. JCTB Inc.*,
  787 F. App'x 43 (2d Cir. 2019) .............................................................................. 11

**Rules**

Fed. R. Civ. P. 9 ................................................................................................................... 1, 19

Fed. R. Civ. P. 12 ..................................................................................................................... 1

**Other Authorities**

U.C.C. § 2-719 ....................................................................................................................... 11

Glencore Singapore Pte Ltd. ("GSPL") respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint ("FAC") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  For the reasons set forth below, the FAC should be dismissed in its entirety.

## PRELIMINARY STATEMENT

This case arises out of GSPL's sale and delivery of marine fuel to four vessels under time charter by Classic Maritime Inc. ("Classic") in Singapore.  The FAC alleges that the fuel contained chemical compounds at concentrations that are not permitted by the technical specifications for marine fuel incorporated into the quality warranties of the sale contracts.  Classic seeks as damages the costs for repairing certain damage to the vessels' engines and equipment allegedly caused by use of the off-specification marine fuel, and the costs of purchasing additional fuel for the vessels to complete their commercial voyages.  As set forth below, Classic expressly agreed in the contracts that it would bear those costs if the marine fuel did not meet specifications.

The FAC should be dismissed for multiple reasons.

*First*, Classic agreed in the sale contracts that, if the fuel did not meet specifications, its "ONLY" remedy would be the direct costs of removing and replacing the fuel.  Classic further agreed that GSPL would not be liable for consequential damages, including for damage to the vessels or their engines, and that GSPL's total liability would not exceed $300,000.  Those provisions require dismissal of Classic's claims for breach of contract (Count I).

*Second*, Classic cannot avoid its agreement by asserting duplicative negligence and strict liability claims (Counts II–IV).  Its claims for economic losses are barred by the economic loss rule, and its claims for physical damage, such as repair costs, are prohibited by the U.S. Supreme Court's *Robins Dry Dock* rule because Classic does not own the vessels.  In addition, whether asserted by Classic or the plaintiff vessel owners, these claims are barred because they seek

1

consequential losses arising from the fuel failing to perform as intended, the subject matter of the claims and the asserted losses were addressed in the contracts among the parties, and those contracts agree that the claimed losses would be borne by Classic. There is no independent, extra-contractual tort duty implicated in this case, and these purported tort claims should be dismissed.

*Third*, Classic's claim for "intentional misrepresentation" (Count V) is based on the quality description of the fuel in the contractual documentation and is wholly duplicative of the contract claims. The FAC also does not plead any facts to suggest that GSPL intended to defraud Classic. Either reason requires dismissal of Count V.

*Fourth*, the claim for gross negligence (Count VI) is also a repackaging of the contract claim, and it does not implicate any tort duty independent of the contracts among the parties. The FAC also fails to plead facts to establish the "particularly malicious behavior" necessary for gross negligence. Among other reasons, GSPL tested the fuel before delivery, including by testing for foreign chemicals, which indicated that the fuel met the contractual requirements. There are no pleaded facts that suggest GSPL's quality assurance protocols deviated in any way from industry standards, let alone facts that make a compelling demonstration of malice, sinister intent, or recklessness that "smacks of intentional wrongdoing," as required for gross negligence.

Classic and the vessel owners therefore cannot avoid their contracts and the allocation of risks and losses to which they agreed. The FAC should be dismissed.

## ALLEGED FACTS AND PROCEDURAL BACKGROUND

### I.    GSPL Agrees to Sell Marine Fuel to Classic

GSPL is a Singapore company, and a supplier of fuel products to the marine industry in Singapore.  FAC ¶ 1.  GSPL buys and sells thousands of metric tons (mt) of fuel components and products to intermediate suppliers and vessel customers in Singapore, every day.  *Id.*

Classic was the time charterer of four vessels that GSPL supplied with marine fuel in early March 2022.  FAC ¶ 4.  Plaintiffs Haikuo Shipping 1621 Ltd., Oceansurf Owners Ltd., and Erwina Shipping Ltd. are the owners of the vessels *Bacon*, *Rangiroa*, and *Tampa*, respectively.  FAC ¶¶ 5–7.  The owner of the fourth vessel, the *Maran Brilliance*, is not a party to this suit.

Pursuant to a fixed forward price contract (as amended, the "FFP"), GSPL contracted to supply Classic's chartered vessels with 7,000 mt of marine fuel per month in the Port of Singapore from July 1, 2021, to December 31, 2022.  FAC ¶¶ 14–15; Exs. A–B.[1]  The FFP warranted that the fuel would meet the technical and quality requirements of the ISO 8217 and MARPOL Annex VI standards.  Ex. A at 1–2.  ISO 8217 is an industry specification that sets out the required chemical and other technical characteristics for marine fuel products that is often incorporated into sale contracts as a quality term.  Clause 5 of ISO 8217 contains "general requirements," including that:  "The fuel shall be free from any material at a concentration that causes the fuel to be unacceptable for use" in marine engines, *i.e.*, "material . . . at a concentration that is harmful to personnel, jeopardizes the safety of the ship, or adversely affects the performance of the machinery."  FAC ¶ 19; Ex. C § 5.2.  Clause 6.6 provides that "[t]he fuel shall be free of inorganic acids."  Ex. C § 6.6.  MARPOL refers to the International Convention for the Prevention of

---

[1]    "Ex. __" refers to exhibits to the Declaration of Peter J. Behmke, submitted herewith.  The Court may consider these documents because they are referenced and relied upon in the FAC.  *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

Pollution from Ships. FAC ¶ 14. Regulation 18 of Annex VI includes substantially the same quality standards as ISO 8217. FAC ¶ 19; Ex. D § 3.1.3.1.

In February 2022, GSPL and Classic agreed on four sale confirmations (or "Bunker Confirmation Notes") under the FFP for the supply of marine fuel to the *Tampa*, *Bacon*, *Rangiroa*, and *Maran Brilliance*. FAC ¶ 16; Exs. E, F, G, H. Each confirmation warranted that the "[q]uality" of the marine fuel would meet the technical requirements of ISO 8217 and MARPOL Annex VI. *See*, *e.g.*, Ex. E at 1–2. The confirmations further provided that GSPL would provide Classic with a "Bunker Delivery Note" at delivery that described the quality of the fuel. *Id.* at 2.

Finally, in the confirmations, Classic and GSPL agreed that each "sale is based on the standard terms and conditions of sale of marine fuel by Glencore" and the "[l]atest seller's General Terms and Conditions to apply." Ex. E at 2. The incorporated General Terms and Conditions for the Sale of Marine Fuels ("GTCs") are governed by New York law or, where applicable, U.S. maritime law. Ex. I § 15(a).

## II.     The Contractual Allocations of Risk Among the Parties

Marine fuel is comprised of the residual product from the refining of oil, which is mixed with lighter fuels or "cutter stock" in various combinations so that the end-product meets the vessel's specifications. FAC ¶ 13. As explained in the ISO 8217 standard, "each fuel is a unique, complex blend of hydrocarbon species" and "a wide range of materials from different sources can enter the marine supply chain from the production, handling and transport systems." Ex. C, Annex B §§ (a)–(b). The ISO 8217 standard recognizes that "[i]dentifying and determining the concentration of a material that causes the fuel to be unacceptable for use can be difficult" and it is "not practical to require detailed chemical analysis for each delivery of fuels." *Id.*, Annex B.

The FAC further acknowledges that the "standard fuel oil testing methods found in the ISO 8217 specification may not detect all contaminants." FAC ¶ 22.

The FAC cites to lawsuits involving non-party Glencore Ltd., an affiliate of GSPL operating in North America, to further show the industry is aware of the risks that foreign substances may enter the supply chain for marine fuel and result in operational problems when consumed by vessel engines. FAC ¶¶ 27–28. The cited lawsuits concerned an industry-wide event in 2018 in which the supply chain for marine fuel in Houston and Panama was contaminated with biofuels and other non-petroleum material (not the organic chlorides at issue in this case), which allegedly caused operational problems and damage to engines when consumed.[2]

Industry participants contractually allocate the risks that foreign chemicals could be introduced, undetected, into marine fuel blends. The prices that buyers pay reflect that allocation of risk. In this case, Classic agreed that GSPL's overall liability under each contract would not exceed $300,000. Ex. I § 7(a). Classic further agreed that, in cases of "off-specification or suspected off-specification supply . . . Seller will be responsible ONLY for direct expenses incurred for removal and replacement of Marine Fuels," subject to the $300,000 liability cap. *Id.* § 7(d). Classic further agreed to bear the risks of all consequential damages, including damage to the vessels or their engines, caused by off-specification fuel:

> Seller's obligations and liabilities hereunder *shall not include any consequential or indirect damages, including* without limitation, deviation costs, demurrage, *damage to any Vessels . . . or to their engines or tanks*, and any actual or prospective loss of profits . . . .

*Id.* § 7(a) (emphasis added).

---

[2]    GSPL operates in Singapore, was not a party to those lawsuits, and was not involved in those purchases or sales. Plaintiffs do not claim there is any causal or other relationship between the events in Houston and Panama to the instant case, which concerns different sources, causes and types of alleged contamination, four years later and 10,000 miles away.

The charter parties between Classic and the vessel owners likewise addressed the risks associated with the supply of off-specification marine fuel to the vessels, and allocated those risks to Classic. Under the charter parties, Classic was obligated to supply the vessels with marine fuels that complied with ISO 8217 and MARPOL quality requirements, and Classic agreed that "[a]ny and all losses suffered as a result of the fuel's non-compliance were Classic's responsibility," including "for the physical damage due to off-spec bunkers suffered by the vessel's engines and the costs of repairing same." FAC ¶¶ 8, 64.[3]

### III. GSPL Tests the Fuel Before Delivery to Classic and Again After Receiving Notice of a Potential Issue

The FAC alleges that GSPL purchased high sulfur fuel oil from a third-party in the United Arab Emirates in January 2022 (the "HSFO"), to be blended with other fuel components and sold as marine fuel to intermediate suppliers and vessel customers in Singapore. FAC ¶ 29.

The HSFO allegedly contained organic chlorides (or "COC"), which the FAC asserts are impermissible under the ISO 8217 and MARPOL specifications in the contracts. FAC ¶¶ 20, 45.

The FAC does not allege that GSPL was aware that the HSFO allegedly contained organic chlorides. To the contrary, the FAC cites to a series of reports issued by the Singapore Maritime and Port Authority ("MPA") (FAC ¶¶ 44–45, 50), which make clear that GSPL tested the fuel for compliance with ISO 8217, and "[t]he contaminated fuel purchased by [GSPL] was in compliance with ISO 8217" (Ex. J ¶ 4). Those same reports explain that GSPL "also performed additional testing of the fuel based on the American Society for Testing and Materials (ASTM) D7845." Ex. J ¶ 4. ASTM D7845 is a standardized test method entitled, "Determination of Chemical Species in Marine Fuel Oil," used to detect foreign chemicals in marine fuel products. Ex. M at 4–5. However, the organic chlorides were not detected because "ISO 8217 and ASTM D7845 do not

---

[3]    "Bunkers" is another term used for marine fuel supplied to a vessel. FAC ¶ 13.

test for COC." Ex. J ¶ 4. The MPA further concluded there was no evidence that GSPL "intentionally contaminated" the fuel. Ex. L ¶ 5; FAC ¶ 50. The FAC does not include any other facts concerning GSPL's testing or quality assurance procedures.

The FAC alleges that, after GSPL's tests showed the fuel met ISO 8217 requirements, a third-party testing company, Viswa Lab, issued a press release on March 1, 2022, that stated "Viswa has identified 3 bunkers supplied in Singapore that had high levels of organic chlorides" and the bunkers were supplied by "2 different suppliers." FAC ¶ 34; Ex. N. GSPL was not mentioned. Ex. N. The FAC further alleges that, on March 2, 2022, Classic itself sent an email to GSPL with a test report for fuel delivered to another vessel that did not show the presence of organic chlorides, but "noted elevated total sediment potential," which the FAC alleges indicated organic chlorides in the fuel aboard that vessel were "likely." FAC ¶¶ 37, 39. The FAC does not plead that GSPL had any additional information concerning the possible presence of organic chlorides, or *any* information that was not equally available to Classic, prior to March 4–5, 2022, when GSPL supplied fuel to three of the vessels in this case: the *Bacon*, *Tampa*, and *Rangiroa*. FAC ¶ 54.

The *Maran Brilliance* was supplied on March 12, 2022. FAC ¶ 41. The FAC alleges that, as of March 12, 2022, GSPL had received "several" notices from vessels of operational issues, with "some" reporting the presence of organic chlorides. FAC ¶¶ 40–41, 50. The FAC does not allege that any of the other "over two hundred" vessels supplied during this period reported any problem with the fuel. FAC ¶ 1. As explained by the MPA, after receiving these customer notices, GSPL "proceeded to test the fuels supplied by its sources used in its blended product . . . [for] COC[s]." Ex. J ¶ 2; FAC ¶ 50. GSPL received the results of those tests indicating organic

7

chlorides in the third-party supplied HSFO on March 21, 2022—nine days after the last delivery to the Classic vessels.  Ex. L ¶ 6; FAC ¶ 50.

## IV.    The FAC Does Not Plead any Deviation from Industry Standards, Bad Faith, or Intent to Defraud or Injure Plaintiffs

The FAC does not allege that GSPL's testing of the fuel prior to delivery to its customers failed to meet industry standards, any GSPL policy or procedure, or any other standard of care. To the contrary, the MPA reports cited by plaintiffs explain that "the occurrence of COC is rare in bunkers," and because "the current international standards do not require tests for COC, the contamination was not promptly detected."  Ex. K ¶¶ 4, 7.

The FAC also does not plead that any other aspect of GSPL's quality control procedures— including its response to the customer notices received prior to March 12, 2022—deviated from industry standards.  For example, the FAC pleads that ISO 8217 required GSPL to have "adequate quality assurance" procedures (FAC ¶ 30), but it does not identify any required procedure that GSPL did not follow.  The FAC similarly alleges that GSPL "must comply with the Singapore Standard for Quality Management for Bunker Supply Chain."  FAC ¶ 24.  That standard contains over 23 pages of procedures for marine fuel supply chain management (Ex. O), and plaintiffs do not allege that GSPL failed to comply with a single one.

The FAC also references the MPA's suspension of GSPL's bunker license for deliveries and events that took place on or after March 21, 2022, that did not involve plaintiffs or their vessels. FAC ¶ 52; Ex. L ¶¶ 6–10.  The MPA did not take action or criticize GSPL with respect to deliveries that occurred prior to March 21, 2022, including the deliveries at issue in this case.  As stated above, the only findings of the MPA relevant to the deliveries to Classic were that GSPL tested the fuel prior to delivery for compliance with ISO 8217, and GSPL did not intentionally contaminate the fuel.  Ex. L ¶ 5.

The FAC also does not allege facts that suggest GSPL had any intent or reason to defraud or injure plaintiffs, or that GSPL acted in bad faith.

## V.    <u>Overview of Plaintiffs' Claims</u>

Plaintiffs allege six overlapping, duplicative counts against GSPL.

Count I pleads that GSPL breached its contractual obligation to deliver fuel complying with the "specifications required for marine bunker fuel under MARPOL Annex VI and ISO 8217:2017," because the fuel allegedly contained material at a concentration that caused the fuel to be unacceptable for use in marine engines and adversely affected the performance of the vessel engines and machinery.  FAC ¶ 73.

The remaining counts are essentially the same contract claim, repackaged as tort claims.

For example, Counts II–IV assert negligence and strict liability claims based on the same alleged facts and technical requirements for marine fuel as the contract claim.  The FAC pleads that GSPL breached a "duty of care" by "failing to use and exercise reasonable care . . . in its supply of bunker fuel" or that GSPL breached a duty to warn that "the components used to blend the bunker fuel contained . . . harmful chemicals" that are not suitable for marine engines under the ISO 8217 and MARPOL standards.  FAC ¶¶ 79, 83–84.

Count V is for alleged "intentional misrepresentations" in the contractual documentation that the marine fuel "would meet the specifications agreed to between the Parties."  FAC ¶ 94.

Count VI also asserts a repackaged contract claim styled as "gross negligence and intentional misconduct," based on the theory that GSPL "had a duty to provide fuel which was not defective" and, "[i]n breach of that duty, [GSPL] delivered fuel which it knew did not satisfy the contract specifications and industry standards."  FAC ¶¶ 97–98.

## VI.  <u>Alleged Damages</u>

The FAC does not seek different damages for the contract versus tort claims.  The claimed damages for all counts are "not for damage to the product itself, but for the physical damages suffered by the Vessel's main and auxiliary engines and associated equipment and the expenses incurred to mitigate the damages the dangerous bunkers threatened."  FAC ¶ 70.  The FAC identifies the latter "expenses" as the costs of "more expensive alternative fuel" purchased by Classic so that the vessels could complete their commercial voyages.  FAC ¶¶ 65, 68.

In the original Complaint, Classic pleaded that it alone incurred these damages, including the repair costs.  ECF No. 1 at ¶ 66.  In its February 3, 2025, letter to the Court, GSPL explained that a time charterer such as Classic is precluded by U.S. Supreme Court precedent from asserting tort claims based on physical damage to the vessel.  ECF No. 13 at 2.  In response, the vessel owners were added as plaintiffs in the FAC, and the FAC now states that "Plaintiffs" are seeking these damages.  *Compare* ECF No. 1 at ¶ 66 *with* FAC ¶ 70.  However, the substantive allegations still demonstrate that Classic alone incurred these alleged damages.  *See*, *e.g.*, FAC ¶ 64 ("Classic is liable for the physical damage . . . and the costs of repairing same.").

## <u>ARGUMENT</u>

## I.  <u>The Contract Claim Should Be Dismissed (Count I)</u>

The breach of contract claim should be dismissed because the claimed damages are barred by the agreed allocations of risk in the sale contracts and GTCs.

### A.    **The Sole Remedy Clause Bars Classic's Claims**

Section 7(d) of the GTCs provides the exclusive remedy to Classic for "off-specification or suspected off-specification supply," as follows: "Subject to and not to exceed the maximum

10

liability of $300,000 . . . Seller will be responsible ONLY for direct expenses incurred for removal and replacement of Marine Fuels."  Ex. I § 7(d).

Under New York law, a contractual provision that modifies the buyer's remedies to "ONLY" replacement of non-conforming goods is enforceable and precludes any claim for other damages.  *See* U.C.C. § 2-719(1)(a) ("the agreement may provide for remedies . . . in substitution for those provided in this Article . . . as by limiting the buyer's remedies to . . . replacement of non-conforming goods"); *see also Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352 (2020) ("[c]ontract terms providing for a sole remedy are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for the purpose of that portion of the transaction") (citations omitted); *Xerox Corp. v. JCTB Inc.*, 787 F. App'x 43, 44 (2d Cir. 2019) (affirming dismissal of contract claim because the "exclusive remedy for a purported breach . . . was not litigation, but to request new equipment") (summary order).

In *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, 2023 WL 6317996 (S.D.N.Y. Sept. 28, 2023) ("*Serifos I*"), Judge Schofield addressed a similar claim asserted by another vessel owner that received fuel from GSPL in Singapore on March 12, 2022.[4]  Judge Schofield enforced section 7(d), and dismissed the contract claim to the extent it sought damages beyond the direct costs of removing and replacing a "de minimis" portion of fuel that was allegedly not replaced by GSPL, subject to the $300,000 cap.  *Id.* at *3.

The FAC pleads that the vessels had to "return to Singapore to be debunkered" where "debunkering – rebunkering operation was completed."  FAC ¶ 68.  To the extent the fuel was

---

[4]       The plaintiffs in the *Serifos* matter were represented by plaintiffs' counsel in this case, and the allegations in *Serifos* and the instant case are substantively identical.  *See* Am. Verified Compl., *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, No. 22-CV-8012 (LGS) (S.D.N.Y. Dec. 12, 2022) (ECF No. 17); Suppl. Proposed Second Am. Verified Compl., *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, No. 22-CV-8012 (LGS) (S.D.N.Y. Feb. 9, 2024) (ECF No. 97).

removed and replaced by GSPL in Singapore, GSPL incurred the "direct expenses" for doing so, and Classic is not entitled to further contract damages. *Serifos I*, 2023 WL 6317996 at *3. Regardless, Classic pleads that it is not seeking costs for "damage to the product itself," *i.e.*, the costs of replacing the fuel. *See Bellevue South Assocs. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 290, 294 (1991) (damages for injury to the product itself include replacement costs). Classic is instead seeking repair costs for damage to the vessel engines and the costs of purchasing more expensive fuels so that the vessels could fulfill their commercial obligations. FAC ¶ 70. The sole remedy clause prohibits the recovery of such compensatory damages. *Serifos I*, 2023 WL 6317996 at *3 (section 7(d) of the GTCs bars claims for "consumption of more expensive fuels"); *see also Neala Commc'ns LLC v. Xerox Corp.*, 747 F. Supp. 3d 625, 645 (W.D.N.Y. 2024) (dismissing contract claim "insofar as it seeks damages other than the contractual remedy of replacement").

Classic is therefore not seeking recoverable damages, and Count I should be dismissed.

### B.    Section 7(a) of the GTCs Bars Classic's Claims

The contract claims are also barred by the limitation of liability in section 7(a) of the GTCs. "[A] limitation of liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994).

In section 7(a), Classic agreed that GSPL's liability "shall not include any consequential or indirect damages, including without limitation, deviation costs, demurrage, damage to any Vessels . . . or to their engines or tanks . . . ." Ex. I § 7(a). The losses claimed by Classic, for damage to the vessel engines and the costs of additional fuels, are both consequential damages and specifically barred by section 7(a). *Serifos I*, 2023 WL 6317996 at *3; *see also VL8 Pool, Inc. v.*

*Glencore Ltd.*, 2021 WL 1152936, at *2 (S.D.N.Y. Mar. 25, 2021) ("*VL8 Pool I*") (identical limitation clause barred claims for "physical damage to [the vessel's] fuel tanks, piping, fuel system, and to its engines and engine components" and "to take on fresh marine fuel"); *Am. Dredging Co. v. Plaza Petroleum*, 799 F. Supp. 1335, 1340 (E.D.N.Y. 1992) ("*Am. Dredging I*") (damage to a vessel's engines and filters caused by off-specification fuel is consequential), *vacated on other grounds*, 845 F. Supp. 91, 93–94 (E.D.N.Y. 1993) ("*Am. Dredging II*").  For this additional reason, Count I should be dismissed.[5]

## II.    <u>The Negligence and Strict Liability Claims Should Be Dismissed (Counts II–IV)</u>

The negligence and strict liability claims should be dismissed because they are barred by the economic loss rule and do not implicate any tort duty independent of the contractual relationships among the parties.

### A.    The Economic Loss Rule Bars Plaintiffs' Claims Because They Seek Economic and Consequential Losses

Plaintiffs' negligence and strict liability claims should be dismissed pursuant to the economic loss rule, because they seek economic losses and consequential damages resulting from the allegedly defective fuel, such as damage to the vessel engines.

"In both admiralty and under New York law, the 'economic loss doctrine' holds that tort recovery in strict products liability and negligence against a manufacturer is not available to an end-purchaser of a product where the claimed losses flow from damage to the property only and personal injury is not claimed."  *Fanok v. Carver Boat Corp., LLC*, 576 F. Supp. 2d 404, 412 (E.D.N.Y. 2008), citing, *inter alia*, *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), *Bocre Leasing Corp. v. Gen. Motors Corp.*, 84 N.Y.2d 685 (1995).  "The rule applies

---

[5]    At a minimum, Classic's claims for damages in excess of the $300,000 cap should be dismissed. *Serifos I*, 2023 WL 6317996 at *3 (enforcing the $300,000 cap at the pleading stage).

to the economic loss to the product itself, as well as to consequential damages resulting from the defect." *Id.*

Thus, to the extent Classic seeks economic losses such as the costs of additional fuel, its claims are barred. *See Goldrich v. Watkins Wellness*, 2024 WL 1194716, at *4 (S.D.N.Y. Mar. 20, 2024) ("the economic loss rule plainly bars tort recovery for the cost of . . . replac[ing] the [defective] product") (cleaned up). Classic is also prohibited from recovering for physical damage to the vessel engines and equipment, such as repair costs, pursuant to the rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). Classic is a time charterer of the vessels, not the owner. FAC ¶ 4. Pursuant to *Robins Dry Dock*, a time charterer lacks the necessary proprietary interest in the vessel to assert tort claims based on damage to the vessel. *Robins Dry Dock*, 275 U.S. at 308; *Am. Petrol. & Transp., Inc. v. City of N.Y.*, 737 F.3d 185, 187–89 (2d Cir. 2013) (adopting the "bright line" *Robins Dry Dock* rule); *G&G Steel, Inc. v. Sea Wolf Marine Transp., LLC*, 2008 WL 192049, *3–4 (S.D.N.Y. Jan. 23, 2008) (*Robins Dry Dock* barred time charterer's negligence claim based on damage to barge's hull); *VL8 Pool I*, 2021 WL 1152936, at *4–5 (*Robins Dry Dock* barred tort claims of time charterer for repair costs and damage to the vessel).

Classic is also prohibited from recovering for damage to the vessel engines and equipment because such damage is a consequential loss resulting from the marine fuel failing to perform as intended. *Fanok*, 576 F. Supp. 2d at 412 (maritime economic loss rule applies "to consequential damages resulting from the defect"). The rule applies notwithstanding that those consequential losses are damage to property. *See Am. Dredging II*, 845 F. Supp. at 93 (economic loss rule barred maritime negligence claim for "consequential damages" including costs to repair damage to vessel

engines caused by contaminated fuel);[6] *see also Bocre Leasing*, 84 N.Y.2d at 691 (rule barred tort claims against manufacturer of engine for damage to a helicopter because it was a "consequential loss[] flowing from" the engine defect); *Weiss v. Polymer Plastics Corp.*, 21 A.D.3d 1095, 1097 (2d Dep't 2005) (rule barred negligence claim based on stucco siding failing to perform as intended and allowing plaintiffs' home to be damaged); *Bristol-Myers Squibb v. Delta Star, Inc.*, 206 A.D.2d 177, 180 (4th Dep't 1994) (rule barred negligence claim for damage to plaintiff's medical products caused by a transformer failing to perform as intended).  Damage to a vessel engine is a natural, foreseeable result of marine fuel failing to perform as intended under normal operating conditions, and it is a consequential loss of the fuel not meeting warranted specifications.  FAC ¶¶ 76, 87, 91–92; Ex. I § 7(a) (defining "consequential damages" to include "damage to any Vessels . . . or to their engines"); *see also VL8 Pool I*, 2021 WL 1152936, at *4 (damage to vessel engine allegedly caused by contaminated fuel "cannot be defined as other than consequential").

The FAC does not identify any losses incurred by the vessel owners.  As stated above, the FAC alleges that Classic purchased the "more expensive alternative fuel" and was liable for any repair costs.  FAC ¶¶ 8, 64–65.  Regardless, any claim of the vessel owners for those economic or consequential losses are likewise barred.  The economic loss rule does not require privity between the claimant and the manufacturer of the product to bar recovery of such losses arising from a product defect.  *See Am. Dredging II*, 845 F. Supp. at 93 (rule barred plaintiff's claims against two-times removed manufacturer of contaminated fuel); *see also Bocre Leasing*, 84 N.Y.2d at 687 (rule barred claims of "four-times-removed-downstream purchaser"); *Atlas Air Inc. v. Gen. Elec. Co.*, 16 A.D.3d 444, 444–45 (2d Dep't 2005) (rule barred claim where there was no privity between

---

[6]    In *American Dredging I*, the court described the claim as follows: "the fuel [] is alleged to have failed to perform as intended and [plaintiff] seeks damages including . . . damages to its vessels' fuel reserves, its vessels' engines and to filters . . . ."  799 F. Supp. at 1340.

plaintiff and manufacturer of defective product); *Amin Realty LLC v. K&R Constr. Corp.*, 306 A.D.2d 230, 231 (2d Dep't 2003) (rule barred claims based on defective product purchased by another for use on plaintiff's property). Accordingly, any claims of the vessel owners for economic losses or physical damage to the vessel engines and equipment should be dismissed.

### B.    The Claims Should Be Dismissed Because the Supply of Marine Fuel and Alleged Losses Are Governed by Contract

These claims should be dismissed for the additional reason that the obligation to provide fuel that is suitable for use by marine vessel engines, and the alleged losses, are governed by the contracts among the parties. These purported tort claims therefore do not implicate an independent tort duty outside of these contractual relationships, and the claims should be dismissed.

It is a "well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987); *Int'l Ore and Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994) (defendant's sole legal duty arose from the contract and therefore maritime negligence claim should have been dismissed). Thus, when the essence of the claim is the breach of a contractual term, and the alleged losses are addressed in the contract, the claim properly sounds in contract, not tort. *Clark-Fitzpatrick*, 70 N.Y.2d at 389; *Int'l Ore and Fertilizer*, 38 F.3d at 1284.

GSPL's obligation to deliver fuel suitable for use in a vessel engine arises from the contractual requirement that the fuel would meet the ISO 8217 and MARPOL warranties. FAC ¶ 19 (ISO 8217 requires that the fuel is "free from any material at a concentration that causes the fuel to be unacceptable for use"; MARPOL requires the fuel "be free from . . . chemical waste that could jeopardize the ship"). Plaintiffs' tort claims merely repackage that contractual obligation as a breach of a "duty of care." FAC ¶¶ 76, 83–85, 90–91.

In the *Serifos* case, Judge Schofield held that nearly identical allegations did not implicate any tort duty outside of the contract. *Serifos I*, 2023 WL 6317996 at *5 ("The Complaint offers no basis to infer an independent duty owed to Plaintiffs by Defendant beyond that which arose from the GTC."); *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, 2024 WL 824486, *2 (S.D.N.Y. Feb. 15, 2024) ("*Serifos II*") (similar). Courts have repeatedly reached the same conclusion and held that marine fuel suppliers do not have some independent, non-contractual duty to deliver fuel that meets the technical requirements for use in a vessel engine. *See*, *e.g.*, *ADMIntermare v. Kamca Trading S.A.*, 2022 WL 845593, at *1, *4 (S.D.N.Y. Mar. 22, 2022) (rejecting argument that sale of "contaminated fuel" that damaged vessel engines breached legal duty independent of contractual ISO 8217 specifications); *Curacao Oil NV v. Trafigura Pte Ltd.*, 2020 WL 3494685, at *8 (Sup. Ct. N.Y. Cnty. Feb. 3, 2020) (where contract required ISO 8217 marine fuel, supplier had no tort duty "to ensure the fuel oil it was supplying did not contain additives or contaminants"), *aff'd*, 189 A.D.3d 404 (1st Dep't 2020); *Centurion Bulk Pte Ltd. v. NuStar Energy Servs., Inc.*, 2020 WL 8368319, at *2 n. 9 (S.D. Tex. Mar. 24, 2020) (dismissing tort claims based on sale of contaminated marine fuel "in light of the Court's finding that the parties formed a valid contract").

The losses claimed by Classic are also addressed in the sale contracts, and were expressly allocated to Classic. *See* Ex. I §§ 7(a), 7(d). Where, as here, the contract contemplates the loss incurred by the plaintiff—even if it involves physical damage—there is no breach of an extracontractual duty. *See Dorm. Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 713 (2018) (dismissing tort claims for physical damage to property where "the only damages alleged appear to have been within the contemplation of the parties under the contract"); *Clark-Fitzpatrick,* 70 N.Y.2d at 390 (no tort duty implicated where plaintiff's damages "were clearly within the contemplation of the written agreement"); *Sing. Airlines, Ltd. v. Gen. Elec. Co.*, 2020 WL 118734,

at *6 (Sup. Ct. N.Y. Cnty. Dec. 30, 2019) (dismissing claim for negligent manufacture of engine that damaged airplane based on limitation of liability that "contemplated the possibility of damages to the aircraft"); *Anunziatta v. Orkin Exterminating Co.*, 180 F. Supp. 2d 353, 359 (N.D.N.Y. 2001) (dismissing negligence claim for damage to house because the contract "specifically exempts damage done to the structure").

Any claims of the vessel owners are barred for similar reasons. The charter parties required Classic to supply the vessels with fuel that met ISO 8217 and MARPOL requirements and allocated the risk of losses "suffered as a result of the fuel's non-compliance" to Classic. FAC ¶¶ 8, 64. Where a plaintiff has a contract with an intermediate party, which in turn has a contract with the defendant, a direct tort claim by the plaintiff against the defendant based on the subject matter and losses addressed in that contractual chain is not viable. Instead, the claim sounds in contract, and the plaintiff is limited to the remedies in its contract with the intermediate party. *See Am. Dredging II*, 845 F. Supp. at 93 (dismissing maritime negligence claim based on damage to vessel engines against two-times-removed seller of contaminated fuel, explaining: "Where parties are in a commercial setting and where they negotiate as to how consequential damages will be allocated . . . one party should not be able to circumvent an agreement by claiming a tort remedy."); *Maersk Line Ltd. v. Care*, 271 F. Supp. 2d 818, 823–25 (E.D. Va. 2003) (where vessel owner had charter party with voyage charterer, which contracted with supplier of contaminated grain that damaged the vessel, court dismissed owner's maritime negligence claim against supplier and held owner must proceed in contract against its voyage charterer).

Accordingly, the negligence and strict liability claims do not implicate any tort duty that is independent of the parties' contracts. Counts II–IV should be dismissed.

**III.**    **The Intentional Misrepresentation Claim Should Be Dismissed (Count V)**

The intentional misrepresentation claim should be dismissed because it is duplicative of the contract claim, and the FAC fails to allege that GSPL had any intent to defraud Classic.[7]

**A.    The Fraud Claim Is Duplicative of the Contract Claim**

As a threshold matter, this purported fraud claim should be dismissed because it is duplicative of the contract claim.  A plaintiff may not assert a fraud claim that is based on statements in the parties' contracts and that arises from the same facts as a breach of contract claim. *See Negrete v. Citibank, N.A.*, 759 F. App'x 42, 48 (2d Cir. 2019) (summary order).  Here, the fraud claim is premised on the allegation that GSPL represented in the contractual documentation "that the bunker fuel . . . would meet the specifications agreed to between the Parties," and the delivered fuel did not meet those specifications.  FAC ¶¶ 94–95.  Judge Schofield dismissed an identical fraud claim in *Serifos I* because it was "essentially a repackaging of the contract claim." 2023 WL 6317996 at *5; *Serifos II*, 2024 WL 824486, at *2 (denying leave to replead because the claims "all emanate fundamentally from Defendant's alleged breach of the fuel contract").

Count V should be dismissed for the same reason.

**B.    The Pleaded Facts Do Not Establish an Intent to Defraud**

The fraud claim should also be dismissed because the FAC does not plead that GSPL intended to defraud Classic.  Fed. R. Civ. P. 9(b); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) ("plaintiffs must allege facts that give rise to a *strong inference of fraudulent intent*") (emphasis in original) (collecting authority).  The FAC does not even allege in a conclusory way

---

[7]    Count V is vaguely asserted on behalf of "Plaintiffs," but the FAC does not plead that GSPL had any dealings whatsoever with the vessel owners, let alone plead the particular facts necessary to establish a fraud claim.  *See Jacquemyns v. Spartan Mullen Et Cie, S.A.*, 2011 WL 348452, at *8 (S.D.N.Y. Feb. 1, 2011) (where plaintiffs "are separate individuals, . . . each of them individually must plead facts tending to demonstrate" a viable claim).

that GSPL had an intent to defraud, let alone plead the particular facts necessary to meet that high

burden.

The FAC does not, for example, allege that GSPL had a motive or any reason to defraud

Classic.  Nor do the factual allegations "constitute strong circumstantial evidence of conscious

misbehavior or recklessness."  *Chill*, 101 F.3d at 267; *see also S. Cherry St., LLC v. Hennessee

*Grp., LLC*, 573 F.3d 98, 112 (2d Cir. 2009) ("By reckless disregard for the truth, we mean

conscious recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a

heightened form of negligence*.") (emphasis original) (cleaned up).

The conclusory allegation that GSPL "knew . . . that its fuel was defective when sold"

(FAC ¶ 3) is unsupported by any fact, but even if taken at face value, does not establish scienter.

*See Duchimaza v. Niagara Bottling, LLC*, 619 F. Supp. 3d 395, 417 (S.D.N.Y. 2022) ("[t]he simple

knowledge that a statement is false is not sufficient to establish fraudulent intent") (collecting

authority).  The remaining allegations, that GSPL "would" have discovered the organic chlorides

if it "properly considered" the communications from other vessel owners (*see, e.g.*, FAC ¶ 99),

also fall well short of establishing an intent to defraud.  *See S. Cherry St.*, 573 F.3d at 112

(allegation that defendant "would" have learned the truth but "failed to take obvious investigative

steps and ignored clear red flags" failed to establish recklessness); *Hoffman v. Kashi Sales, L.L.C.*,

646 F. Supp. 3d 550, 564 (S.D.N.Y. 2022) ("constructive knowledge" allegations are "manifestly

insufficient") (cleaned up); *Matana v. Merkin*, 2014 WL 426857, at *4 (S.D.N.Y. Feb. 4, 2014)

(defendant "may well have been irresponsible or slipshod if he did not attempt to learn" the truth,

"but irresponsibility does not equate to fraudulent intent.").

In short, plaintiffs cannot establish fraudulent intent.  Count V should be dismissed.

20

**IV.**     **The Gross Negligence Claim Should Be Dismissed (Count VI)**

The gross negligence claim should also be dismissed because it is duplicative of the contract claim, and the pleaded facts fail to establish egregious intentional misbehavior.[8]

**A.**     **The Gross Negligence Claim Does Not Implicate an Independent Tort Duty**

Count VI should be dismissed for the same reason as the negligence, strict liability and fraud claims:  it is substantively identical to the claim for breach of contract, and no independent tort duty is implicated. The claim is premised on an alleged duty to provide marine fuel that "was acceptable for use in the Vessels' machinery" and satisfied "the contract specifications or industry standards," and it seeks the same damages as the contract claim.  FAC ¶¶ 97–98.  This is just a repackaging of Classic's claim for breach of the ISO 8217 and MARPOL contractual warranties. In *Serifos I* and *Serifos II*, Judge Schofield dismissed the same gross negligence claim, premised on substantively identical allegations.  *Serifos I*, 2023 WL 6317996 at *5; *Serifos II*, 2024 WL 824486, at *2.  Moreover, the subject matter of this claim and the alleged losses are specifically addressed in the contracts among GSPL, Classic, and the vessel owners.  Thus, for the reasons set forth in Arg. § II(B), *supra*, whether asserted by Classic or the vessel owners, this claim properly sounds in contract, not tort, and Count VI should be dismissed.  *See Clark-Fitzpatrick,* 70 N.Y.2d at 390 (applying these principles to gross negligence claim).

**B.**     **The Pleaded Facts Fail to Meet the High Standard for Gross Negligence**

Count VI should also be dismissed because the pleaded facts do not establish the malicious, sinister or reckless misconduct required for gross negligence.

---

[8]     Count VI also includes the label "intentional misconduct," evidently to challenge the allocations of risk in the GTCs.  *See*, *e.g.*, FAC ¶ 73.  Intentional misconduct requires an intent to injure the plaintiff, which is not pleaded.  *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438 (1994) ("the term willful acts . . . [means] wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract").

To plead gross negligence, a plaintiff must make "nothing short of a compelling demonstration of egregious intentional misbehavior evincing extreme culpability." *Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544 (S.D.N.Y. 2013) (citation omitted); *Mindspirit v. Evaluserve Ltd.*, 2016 WL 11707410, at *10 (S.D.N.Y. Sept. 26, 2016) ("Gross negligence implies willful or intentional misconduct."). The pleaded facts come nowhere close to meeting this standard.

Count VI alleges that GSPL "failed to undertake the legally required and industry recognized quality assurance procedures and/or satisfy its own and industry testing standards," or that GSPL "took no action to investigate" after receiving indications of a potential issue. FAC ¶¶ 99–100. In *Serifos I*, Judge Schofield reviewed the same allegations and held they failed to establish gross negligence. 2023 WL 6317996 at *4. The only difference between *Serifos I* and the instant case is that three of the vessels here, the *Bacon*, *Tampa*, and *Rangiroa*, were supplied before GSPL received a single notice from a vessel customer that organic chlorides had been detected. (The *Maran Brilliance* was supplied on approximately the same date as the vessel in *Serifos I*). *See* Am. Verified Compl. ¶ 12, *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, No. 22-CV-8012 (LGS) (S.D.N.Y. Dec. 12, 2022) (ECF No. 17).

Judge Schofield's conclusion was well-supported and applies equally here. In another similar case, *VL8 Pool, Inc. v. Glencore Ltd.*, 2021 WL 6113981 (S.D.N.Y. Dec. 27, 2021) ("*VL8 Pool II*"), the supplier's initial testing of marine fuel showed it was "on-spec," but the plaintiff alleged the supplier was grossly negligent because it "had actual or constructive knowledge" that the fuel "was contaminated and dangerous to use" based on vessel complaints received prior to the delivery to the plaintiff. *Id.* at *1, *3. However, the court held the plaintiff did not allege that the supplier needed to do anything more than the initial testing of the fuel, and a "failure to act" on the

customer reports was not conduct of "such aggravated character" that it could make a "*plausible* showing of gross negligence." *Id.* at *3 (emphasis original) (collecting authority).

As in *VL8 Pool II*, there are no pleaded facts that suggest GSPL's initial testing deviated from industry or GSPL standards in any respect—let alone facts that establish the requisite extreme departure from them. *VL8 Pool II*, 2021 WL 6113981 at *3; *see also Howe v. Ethicon, Inc.*, 2022 WL 2316375, at *2, *6 (S.D.N.Y. June 27, 2022) (general allegations that manufacturer failed to perform "adequate testing" of defective product do "not sufficiently allege what and how Defendant's alleged misconduct was an extreme departure from the standards of ordinary care") (cleaned up).

Further, the FAC pleads that, before supplying the *Bacon*, *Tampa*, and *Rangiroa*, the only indications of a potential issue was the Viswa Lab press release, which did not mention GSPL, and an email from Classic itself that reported elevated sediment levels, not organic chlorides. FAC ¶¶ 34–35, 39. The FAC does not plead any facts that demonstrate a "failure to act" on that limited information constituted an egregious departure from any industry standard or GSPL policy. *VL8 Pool II*, 2021 WL 6113981 at *3. And after receiving notice from several customers of a potential issue, GSPL engaged an independent, third-party laboratory to investigate by performing more sophisticated tests on the fuel. Alleged Facts § IV, *supra*. The fact that GSPL performed tests both before delivery and after notice of a potential issue precludes any claim that it failed to exercise "even slight care," amounting to recklessness. *See Howe*, 2022 WL 2316735, at *6 ("gross negligence requires a plaintiff to prove that the defendant failed to exercise even slight care"); *Condoleo v. Guangzhou Jindo Container Co.*, 427 F. Supp. 3d 316, 335 (E.D.N.Y. 2019) (inspection of defective product prior to delivery defeated any claim that defendant "failed to exercise even slight care"), *report and rec. adopted*, 427 F. Supp. 3d 316, 324 (E.D.N.Y. 2019).

The FAC does not include any other pleaded facts that establish the requisite "particularly malicious behavior." *Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.*, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005).  The FAC references customer notices received after the deliveries to Classic, and the MPA's suspension of GSPL's bunker license based on events that took place on or after March 21, 2022.  Those same allegations failed to establish gross negligence with respect to the March 11–12, 2022, delivery to the *Serifos* plaintiff, and fail to establish gross negligence for the March 3–4 or 12, 2022, deliveries at issue here.  *See* Suppl. Proposed Second Am. Verified Compl. ¶¶ 12, 26–48, *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, No. 22-CV-8012 (LGS) (S.D.N.Y. Feb. 9, 2024) (ECF No. 97).  Among other reasons, GSPL's intent and state of mind can only be assessed based on the facts as they existed when the alleged conduct occurred; events from March 21, 2022, forward are irrelevant.  *See VL8 Pool II*, 2021 WL 6113981, at *3 (considering only vessel complaints and information known to marine fuel seller at the time of delivery to plaintiffs).

The remaining allegations are just conclusory labels such as "drastic," "extreme" or "callous" appended to the same substantive allegations underlying the contract, negligence and strict liability claims.[9]  They do not meet the high standard for gross negligence as a matter of law. *See D'Amico v. Waste Mgmt. of N.Y., LLC*, 2019 WL 1332575, at *8 (W.D.N.Y. Mar. 25, 2019) ("Simply appending conclusory words or phrases such as 'knowingly' or 'intentionally,' to allegations of ordinary negligence does not satisfy the aggravated nature of a gross negligence claim.") (collecting authority); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 644 (E.D.N.Y. 2000) ("heated language and indignation will not suffice"); *Indus. Risk Insurers*, 387

---

[9]     *Compare*, *e.g.*, FAC ¶ 91 (strict liability: GSPL "failed to conduct reasonable inspections to identify defects in the components of the bunker fuel") *with* FAC ¶ 99 (gross negligence:  labelling same as "extreme departures from [] legal requirements and industry and Glencore's own standards"); FAC ¶ 85 (strict liability:  GSPL "failed to warn Plaintiffs . . . of the bunkers' latent dangers") *with* FAC ¶ 101 (gross negligence:  "In callous disregard of its responsibilities, Glencore made no efforts to remedy or advise Plaintiffs of the non-compliant fuel . . . .").

F. Supp. 2d at 307 ("If a party needs only to add gross negligence as a theory of liability to force litigation to proceed through discovery and trial, contracting parties would be stripped of the substantial benefit of their bargain, that is, avoiding the expense of lengthy litigation.").

Count VI should therefore be dismissed.

## **<u>CONCLUSION</u>**

The FAC should be dismissed in its entirety.

Dated:   New York, New York
          March 28, 2025

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP

By:   */s/ Peter J. Behmke*
        Peter J. Behmke
        Michael P. Jones
        Daniel Gomez
      200 Park Avenue
      New York, New York 10166
      Tel:  (917) 542-7600
      Fax:  (917) 542-7601
      Email:  Peter.Behmke@hsf.com
                Michael.Jones@hsf.com
                Daniel.Gomez@hsf.com

*Attorneys for Glencore Singapore Pte Ltd.*

## ATTORNEY CERTIFICATION OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the preceding Glencore Singapore Pte Ltd.'s Memorandum of Law in Support of Motion to Dismiss (the "Supporting Memo"), exclusive of the caption and signature block, contains 8,150 words, and therefore complies with the 8,750 word limitation that is applicable to memoranda of law.  In determining the Supporting Memo's compliance, I relied on the word count function of the word processing system that was used to prepare the Supporting Memo.

Dated:         New York, New York
               March 28, 2025

                                            */s/ Peter J. Behmke*
                                            Peter J. Behmke

                                            *Attorney for Glencore Singapore Pte Ltd.*