USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/10/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLASSIC MARITIME INC., HAIKUO SHIPPING 1621 LTD., OCEANSURF OWNERS LTD., and ERWINA SHIPPING LTD.

Plaintiffs,

-against-

GLENCORE SINGAPORE PTE LTD,

Defendant.

---

1:24-cv-9741-MKV

ORDER GRANTING
MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Classic Maritime Inc. ("Classic"), Haikuo Shipping 1621 Ltd., Oceansurf Owners Ltd. and Erwina Shipping, Ltd. (the "Vessel Owners") maintain this action against Defendant Glencore Singapore PTE LTD (GSPL) for breach of contract (Count 1), negligence (Count 2), strict liability (Counts 3 and 4), intentional misrepresentation (Count 5), and gross negligence and intentional misconduct (Count 6).[1]  *See* [ECF No. 18] (the "First Amended Complaint" or "FAC").  GSPL moves to dismiss under Rules 9(b) and 12(b)(6).

## BACKGROUND[2]

GSPL sells fuel (called "bunkers") to seafaring vessels in Singapore.  FAC ¶ 1.  Classic

---

[1] Originally, Classic was the sole plaintiff.  [ECF No. 1].  In response to a letter to the Court from GSPL seeking a pre-motion conference on an anticipated motion to dismiss, [ECF No. 13] at 2 (raising an issue regarding Classic's standing to assert claims arising from damage to vessels it does not own), the Vessel Owners were added as Plaintiffs, *Compare* [ECF No. 1] *with* FAC.  Plaintiffs did not address this issue in their letter indicating forthcoming amendment, [ECF No. 17] (referring only to "an issue raised in the Defendant's pre-motion letter"), and it has been briefed only obliquely in connection with the motion to dismiss now before me, *see* [ECF No. 24 (the "MTD")] at 10 ("In response [to the pre-motion letter], the vessel owners were added as plaintiffs in the FAC, and the FAC now states that 'Plaintiffs' are seeking these damages. . . . However, the substantive allegations still demonstrate that Classic alone incurred these alleged damages." (citations omitted)).

[2] The facts are drawn from the First Amended Complaint, and which are accepted as true and construed in the light most favorable to Plaintiff for purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019).  The Court also considers "documents attached to the complaint as an exhibit or incorporated in it by reference." *Chambers v. Time Warner. Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

was the time-charterer of four such vessels: the M/V BACON, the M/V RANGIROA, the M/V TAMPA, and the M/V MARAN BRILLANCE (the "Vessels"). FAC ¶ 4. The Vessel Owners owned the first three of these vessels; the owner of the MARAN BRILLANCE is not a party to this action. FAC ¶¶ 5–7. Classic entered into an agreement to purchase thousands of metric tons of bunkers from GSPL at a fixed price monthly over the course of the relevant period (the "Fixed Forward Price" or "FFP" contract). FAC ¶¶ 14–15. The bunkers were to be supplied to Classic's vessels (a process known as "stemming") in Singapore. FAC ¶ 14. The relationship was governed by Glencore's General Terms and Conditions for the Sale of Marine Fuel (the "General Terms and Conditions"). FAC ¶¶ 12, 67.

The FFP included terms requiring satisfaction of certain industry standards that are enforced internationally by individual countries, ports, and contracting parties. *Id.* Specifically, the FFP incorporated the bunker quality protocols laid out in the International Standards Organization ("ISO") Standard 8217:2017, and the International Convention for the Prevention of Pollution from Ships ("MARPOL") Annex VI. *Id.* GSPL also routinely issued Bunker Confirmation Notes ("BCNs"), confirming the compliance of upcoming stems with these standards, FAC ¶ 16, and Bunker Delivery Notes ("BDNs"), again confirming the same with respect to completed stems, FAC ¶ 18. Bunkers containing chlorinated organic compounds ("COCs"), which can give rise to catastrophic risks at sea, do not meet these standards. FAC ¶ 20.

In March 2022, GSPL stemmed the Vessels with COC-contaminated bunkers. FAC ¶ 54, 57–61. The first three Vessels were stemmed on March 4 and 5, 2022, while the MARAN BRILLANCE was stemmed on March 12, 2022. *Id.* GSPL was under various contractual, regulatory, and legal obligations to exercise due diligence before, during, and after stemming. *See, e.g.*, FAC ¶ 24. Plaintiffs' initial tests did not reveal the presence of COC in the

2

bunkers.  FAC ¶ 56.

Between January and April of 2022, Glencore supplied (directly or indirectly) over 200 ships in the Port of Singapore with bunkers from a batch of fuel that it had sourced from the Port of Khor Fakkan in the United Arab Emirates earlier that year in January.[3]  FAC ¶ 29.  By March 1, an industry-wide alert indicated that ships recently stemmed in the Port of Singapore were encountering issues caused by COC-contaminated fuel, although the alert did not at that time specifically identify Glencore as the supplier.  FAC ¶¶ 34–35.  By March 11, another alert had been issued to the same effect.  FAC ¶ 36.  Affected vessels informed Glencore of the issues they were experiencing—if not the specific cause—possibly as early as February, and certainly by March 2, 2022.  FAC ¶¶ 35–37, 39.  At unidentified times between March 2 and March 12, numerous vessels made more specific complaints, including with reference, in an unidentified number of instances, to lab reports identifying COC-contamination.  FAC ¶¶ 40–41.

On or around March 14, 2022, the Maritime Port Authority of Singapore (the "MPA") directed GSPL to contact its customers and admonish them to "exercise caution when using" the at-issue bunkers.  FAC ¶ 43 (quotation omitted).  GSPL did not provide this independent admonition to Plaintiffs.  *Id.*  In a subsequent proceeding, the MPA found that Glencore was on notice of the COC contamination by March 21, 2022, and therefore had violated applicable

---

[3] Various entities affected by these stems have sued Glencore on the same basic set of facts.  In the *Serifos* matter, the owner of a vessel stemmed on March 11, 2022, sued Glencore on identical claims to those brought here, through the same counsel, and in the shadow of the same General Terms and Conditions.  *Serifos Mar. Corp. v. Glencore Sing. Pte Ltd.*, 2023 WL 6317996 (S.D.N.Y. Sept. 28, 2023) ("*Serifos I*") (dismissing all tort claims and allowing the breach of contract claim to proceed subject to a $300,000 damages limitation), *aff'd*, 2025 WL 1554798 (2d Cir. June 2, 2025) (summary order); *see also Serifos Mar. Corp. v. Gloencore Sing. Pte Ltd.*, 2024 WL 824486, *2 (S.D.N.Y. Feb. 15, 2024) ("*Serifos II*") (denying leave to amend), *aff'd sub nom. Serifos Mar. Corp. v. Glencore Singapore Pte Ltd.*, 2025 WL 1554798 (2d Cir. June 2, 2025) (summary order).  Similarly, in the *VL8 Pool* matter, the time-charterer of a vessel stemmed on March 11, 2022, by an intermediary under the same General Terms and Conditions, sued Glencore on breach of contract and warranty, negligence, product liability, and indemnity and contribution claims.  *VL8 Pool, Inc. v. Glencore Ltd.*, 2021 WL 1152936 (S.D.N.Y. Mar. 25, 2021) ("*VL8 Pool I*") (granting motion to dismiss with leave to amend); *VL8 Pool, Inc. v. Glencore Ltd.*, 2021 WL 6113981 (S.D.N.Y. Dec. 27, 2021) ("*VL8 Pool II*") (dismissing all claims).  While these decisions have no preclusive effect, the Court finds their reasoning, applied to similar if not identically pled facts, persuasive and helpful.

regulations by continuing to stem vessels with the implicated bunkers through April 1, 2022.  FAC ¶ 50.

After stemming, still unaware of the COC contamination, the first three Vessels navigated away from Singapore along their scheduled routes.  FAC ¶¶ 51–56.  Each experienced operational issues arising from the presence of COC in the GSPL-supplied bunkers.  FAC ¶¶ 57–59.  These issues prompted Classic to conduct further testing that revealed the COC contamination.  FAC ¶ 60.  Because it was stemmed later, the MARAN BRILLANCE ceased consumption of the contaminated bunkers earlier in its journey.  FAC ¶¶ 61–64.  In every case, the Vessels were required to consume alternative fuel bought on the spot.  FAC ¶ 65.  Moreover, because there were no ports available to discharge contaminated bunkers, the Vessels had to keep those bunkers on board while stopping off at various ports to purchase and load non-contaminated fuel on an *ad hoc* basis.  *Id.*  Classic was responsible under its charter agreements for any damage suffered by the Vessels and for the costs of repairing such damage.  FAC ¶ 64.

Along the way, Plaintiffs kept GSPL apprised of their problems and efforts to mitigate losses.  FAC ¶ 66.  Under GSPL's General Terms and Conditions, any liability was limited to $300,000, and the sole remedy available to the Vessels was compensation for "direct expenses incurred for removal and replacement" of defective bunkers.  FAC ¶¶ 66–67.  Invoking these provisions, GSPL informed Plaintiffs that they would need to return to Singapore for removal and replacement.  FAC ¶ 67–68.

Plaintiffs now seek damages "for the physical damages suffered by the Vessels' . . . engines and associated equipment and the expenses incurred to mitigate the damages the dangerous bunkers threatened."  FAC ¶ 70.

### **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "[O]n a motion to dismiss, a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference.'" *Chambers*, 282 F.3d at 152–53 (quoting *Brass*, 987 F.2d at 150).

The Court has admiralty and maritime jurisdiction under 28 U.S.C. § 1333.  To the extent that no admiralty rule governs, New York law—or the law implied by the Parties' briefing—applies.  *See Serifos I*, at *2.

## DISCUSSION

### I.    Classic's Contract Claim[4]

The governing General Terms and Conditions contain two clauses that Defendant argues bar Classic's contract claim.  MTD at 10-13 (citing [ECF No. 23-9]).  First, the General Terms and Conditions provide that:

> Seller's obligations or liabilities hereunder shall not include any consequential or indirect damages, including without limitation, deviation costs, demurrage, damage to any Vessels or Buyer's Delivery Vessels or to their engines or tanks, and any actual or prospective loss of profits, and . . . Seller's maximum liability under this Contract shall not exceed the lesser of the price charged to the Buyer for the Marine Fuels supplied under this Contract or the sum of USD Three Hundred Thousand (US$300,000.00).

General Terms and Conditions 7(a) (the "Limitation Clause").

Next, the General Terms and Conditions provide that:

> Buyer shall take all reasonable measures, including retention and

---

[4] Classic is the only Plaintiff that asserts this claim.  *See* FAC ¶¶ 72, 74.

5

> burning of Marine Fuels in accordance with Seller's instructions, to eliminate or minimize any costs associated with an off-specification or suspected off-specification supply. Subject to and not to exceed the maximum liability of $300,000 as stated in Section 7 (a) above, Seller will be responsible ONLY for direct expenses incurred for removal and replacement of Marine Fuels. If Buyer removes such Marine Fuels without the consent of Seller, then all such removal and related costs shall be for Buyer's sole account.

General Terms and Conditions at 7(d) (the "Sole-Remedy Clause").

Classic argues that GSPL's gross negligence or willful misconduct renders the Limitations and Sole-Remedy Clauses (the "Clauses") unenforceable as a matter of public policy. Opp. at 12–18. As an initial matter, grossly negligent conduct invalidates only exculpatory or nominal damages clauses. *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 353 (2020). Classic argues that the Clauses were effectively exculpatory or nominal because "if enforced as GSPL seeks" they "would" result in Classic "receiv[ing] $300,000 of replacement fuel of the quality [it] understood [it was] buying in the first place" after "paying nearly $1.0 million for . . . bad bunkers and spending another $1.0 million . . . to get [to Singapore]," where GSPL insisted de- and re-bunkering take place. Opp. at 18.

Had this outcome been alleged as something that had actually happened, perhaps it could have sufficed to show that the Clauses effectively operated in a manner that was exculpatory or that limited liability to a merely nominal sum. *Compare Part 60 Put-Back*, 36 N.Y.3d at 355 (finding that "the sole remedy provision provided a mechanism by which defendants could correct the breach . . . which was intended to make [plaintiff] whole") *with IS Chrystie Mgmt. LLC v. ADP, LLC*, 205 A.D.3d 418, 420 (1st Dep't 2022) (whether a clause allowing for "recover[y of] three months of the fees . . . paid to defendant" amounted to an exculpatory clause was at least a triable issue of fact); *but see Part 60 Put-Back*, 36 N.Y.3d at 353 ("We have previously considered the application of the gross negligence public policy rule only in cases where the contract provision at

issue was an exculpatory clause, purporting to wholly immunize a party from liability, or a nominal damages clause limiting damages to, at most, $250 . . . .").

But the Amended Complaint does not allege anything about the amount or value of replacement fuel actually supplied by GSPL under the Sole-Remedy Clause, *cf.* [ECF No. 32] (the "Reply") at 4 ("GSPL provided Classic with millions of dollars of replacement fuel."), or even whether this remedial operation in fact took place, *cf.* Reply at 2 ("Plaintiffs do not dispute that GSPL removed and replaced the fuel in Singapore."). If Glencore in fact removed and replaced the bad bunkers, it is difficult to understand how "no part of" the $300,000 in direct expenses contemplated by the Sole-Remedy Clause "has been paid although duly demanded."[5] *See* FAC ¶ 74.

Accordingly, in the circumstances it pled, Classic needed to allege willful misconduct on the part of GSPL in order to disable operation of the Limitation and Sole-Remedy Clauses.[6] *See Part 60 Put-Back*, 36 N.Y.3d at 353. Classic has not done so. "The repeated invocations of the word[s,]" *Spoleto Corp. v. Ethiopian Airlines Grp.*, 2022 WL 329265, at *11 (S.D.N.Y. Feb. 3, 2022), *aff'd*, 2022 WL 17574469 (2d Cir. Dec. 12, 2022), "intentional," "willful," and "potential catastrophe[e]," FAC ¶¶ 37, 46, 52, 68, 69, 73, 100, "unsupported by concrete factual allegations,

---

[5] For the same reason, the Court cannot decide that the Sole-Remedy Clause "failed of its essential purpose" so as to become invalid. Opp. at 11–12.

[6] Even if Classic needed to show only gross negligence, "[f]ederal courts applying New York law have consistently applied the higher standard of 'reckless disregard' in cases where a party seeks to pursue a claim of gross negligence despite a release of liability." *Indus. Risk Insurers v. Port Auth. of New York & New Jersey*, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005), *aff'd in part, remanded in part sub nom. Indus. Risk Insurers v. Port Auth. of N.Y. & NJ*, 493 F.3d 283 (2d Cir. 2007), *and adhered to sub nom. Indus. Risk Insurers v. The Port Auth. of New York & New Jersey*, 2008 WL 282273 (S.D.N.Y. Jan. 30, 2008); *see also Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544 (S.D.N.Y. 2013). Classic has not met this standard. *See VL8 Pool II* at *3 (having previously assumed without analysis that the clauses at issue were exculpatory, *see VL8 Pool I* at *3, still finding that allegations that Glencore "had actual or constructive knowledge . . . that the marine fuel . . . was contaminated and dangerous to use . . . [yet r]ather than take steps to fix the condition of the fuel or inform customers . . . continued selling the fuel worldwide" did not plausibly amount to gross negligence where "only two customers . . . reported an alleged problem with the fuel . . . prior to the date of fuel delivery to [plaintiff]").

do not make [Plaintiff's] claim of [willful misconduct] plausible[.]" *Spoleto*, at \*11.  Here, GSPL allegedly continued to sell the at-issue bunkers after having received sporadic notice that might have alerted it to COC contamination,[7] FAC ¶¶ 34–41; and, after all the stems in this case had occurred, GSPL allegedly did not comply with a directive to independently caution its customers regarding careful use of the at-issue bunkers,[8] FAC ¶ 43. These are plainly not allegations of conduct that was "fraudulent, malicious or prompted by the sinister intention of one acting in bad faith." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413, 416–17 (1983) (cleaned up).

This means that Classic's contract claim is barred to the extent it seeks anything more than $300,000 of "direct expenses incurred for removal and replacement of" the off-specification fuels. Sole-Remedy Clause; *see also Serifos II*, at \*2 ("The SAC seeks recompense for the '[c]osts, time, and additional bunkers consumed to prevent catastrophic damage and mitigate losses,' agency fees, sampling expenses, and the costs of fuel shortages.  Except for the cost of replacing the defective fuel up to a limit of $300,000, the remaining damages are either consequential damages or are barred by explicit contractual limitations (*e.g.*, deviation costs).").

As mentioned above, Classic has not provided the Court with any allegations regarding the amount or value of replacement fuel provided by GSPL.  Accordingly, in light of the Limitation

---

[7] The Court notes Plaintiffs' own allegation that the MPA's investigation determined that Glencore was on notice of the COC contamination by March 21, 2022,  FAC ¶ 50, over a week ***after*** the latest stem in this case.

[8] Plaintiffs' allegations, however, seem to suggest that Plaintiffs had already become aware of the contamination by this date, and were in communication with GSPL about it.  *See* FAC ¶ 57–63, 66.

and Sole-Remedy Clauses, Classic has not sufficiently pleaded a claim for contractual damages.

Classic's contract claim is therefore DISMISSED with leave to amend.

## II.    The Negligence and Strict Liability Claims Sound in Contract

Plaintiffs' attempt to reframe this contract claim in terms of unintentional tort fails.

As an initial matter, the Court is not entirely convinced by GSPL's argument that these claims are barred by "the rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927)." MTD at 14. As pronounced by the Second Circuit, the rule has come to mean "that economic losses are not recoverable for an unintentional maritime tort in the absence of physical injury" to property in which the victim has a proprietary interest. *Am. Petroleum & Transp., Inc. v. City of New York*, 737 F.3d 185, 196 (2d Cir. 2013). But Plaintiffs here have alleged more than generalized "main and auxiliary [engine] issues." *Serifos I*, at *1. Specifically, they have alleged actual "physical damages suffered by" those engines. FAC ¶ 70.

It is, however, not necessary at this stage to delve into potentially fact-intensive inquiries under this rule, such as whether Classic had a proprietary interest in the Vessels sufficient to permit recovery, *see G&G Steel Inc. v. Sea Wolf Marine Transp. LLC*, 380 F. App'x 103, 104 (2d Cir. 2010) (summary order); *VL8 Pool I*, at *5, or the extent to which the cost to repair or mitigate the alleged physical damages veers into foreclosed economic loss,[9] *see Am. Dredging Co. v. Plaza Petroleum Inc.*, 845 F. Supp. 91, 93 (E.D.N.Y. 1993); *Gas Nat. SDG S.A. v. United States*, 2007 WL 959259, at *5 (S.D.N.Y. Mar. 22, 2007), *aff'd*, 2008 A.M.C. 2992, 2008 WL 4643944 (2d Cir. Oct. 21, 2008) (summary order).

This is because the risks giving rise to what Classic and the Vessel Owners have styled as

---

[9] GSPL asserts that "Plaintiffs do not dispute" that "the vessel owners' claims are barred by the economic loss doctrine." Reply at 5. This is not correct: Plaintiffs argue that "[t]he Vessel Owner Plaintiffs have [the] proprietary interest in the property [that] was damaged . . . necessary to avoid the application of the economic loss rule." Opp. at 18–19. Nevertheless, all of the Plaintiffs' unintentional tort claims are barred on other grounds.

negligence and strict liability claims were, according to Plaintiffs' own allegations, allocated in advance by contractual relationships amongst the Parties. *See* FAC ¶¶ 8, 14, 64. And "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987); *see also Int'l Ore and Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994); *ADMIntermare v. Kamca Trading S.A.*, 2022 WL 845593, at *4 (S.D.N.Y. Mar. 22, 2022); *Curacao Oil NV v. Trafigura Pte Ltd.*, 2020 WL 3494685, at *8 (Sup. Ct. N.Y. Cnty. Feb. 3, 2020).

With respect to Classic, this conclusion is easily reached. GSPL's duty to supply fuel compliant with the specifications laid out in ISO Standard 8217:2017 and MARPOL Annex VI was provided for by, and must be evaluated in terms of, the contractual agreements between Classic and GSPL. *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1284 (2d Cir. 1994). So too, as discussed above, is any liability arising from a failure to fulfill that duty both prescribed and limited by those same agreements. *See supra*, Section I. Plaintiffs have not alleged "an abrupt, cataclysmic occurrence not contemplated by the contracting parties." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 713, 94 N.E.3d 456 (2018) (quotations omitted). Instead, they are "essentially seeking enforcement of contract rights." *Id.*

With respect to the Vessel Owners, this essential situation appears at first glance to be somewhat diluted, to the extent that they are not in privity with GSPL.[10] Nevertheless, Plaintiffs have clearly alleged that "[u]nder the respective charter parties, Classic is liable for the physical damage due to off-spec bunkers suffered by the vessel's engines and the costs of repairing same."

---

[10] Read charitably, Plaintiffs appear to have raised this argument in their briefing on the inapplicability of the economic-loss doctrine. *See* Opp. at 19 ("[T]he Vessel Owners . . . maintain the right to pursue either [their] contract debtor [Classic] or the tortfeasor defendant [GSPL]."). Accordingly, the Court does not take GSPL up on the invitation to treat it as waived. *See* Reply at 5.

FAC ¶ 64.  In other words, the Vessel Owners' contracts **with Classic** bar them from bringing tort actions against GSPL on the facts alleged here.[11]  *See Am. Dredging* at 93 (holding tort claims against supplier, seller, and carrier of contaminated fuel foreclosed by the economic-loss doctrine, where the plaintiff "had the opportunity to . . . negotiate[ the allocation of consequential damages] with [the seller]."").  Unlike in *American Dredging*, the Court has not determined that the damages sought by the Vessel Owners are unrecoverable in tort because they are economic losses.[12]  Instead, the point here is that the Vessel Owners' damages—however categorized—are contemplated by applicable contractual arrangements.  Under the charter agreements "Classic was obligated to supply the vessels with marine fuels [that] complied with" ISO Standard 8217:2017 and MARPOL Annex VI, FAC ¶ 8, such that the Vessel Owners' "remedy properly lies in contract not in tort."  *Am. Dredging* at 93.

Amendment would be futile as it could not circumvent the contractual allocations of risk entered into by the Parties.  Plaintiffs' negligence and strict liability claims are therefore DISMISSED without leave to amend.

### III.   The Intentional Misrepresentation Claim Sounds in Contract, and Plaintiffs Have Not Alleged Fraudulent Intent

Plaintiffs' intentional misrepresentation claim likewise fails.  "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . .  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "Despite

---

[11] The Court does not express an opinion as to whether the Vessel Owners might have contractual claims against GSPL as, for example, third-party beneficiaries of the agreements between Classic and GSPL, because no such claims have been raised.

[12] *American Dredging*, 845 F. Supp. 91, decided in the Eastern District of New York, was affirmed in its articulation of the economic-loss doctrine by the Second Circuit's decision in *American Petroleum*.  737 F.3d at 195–96. Nevertheless, the court in *American Dredging* appears to have based its determination that the economic-loss rule was applicable on the fact that contractual arrangements existed between the parties. *Am. Dredging* at 93.  But foreclosing a plaintiff's recovery of economic-loss-based tort claims does not depend on the plaintiff's ability to recover under a contract.  In that respect, the Court finds the cited portions of *American Dredging* more persuasive with respect to the argument that the Vessel Owners' claims sound in contract, if they properly sound at all.

11

Rule 9(b)'s lower standard for scienter, . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (quotation omitted, emphasis omitted).

As an initial matter, Plaintiffs do not even dispute that they have failed to adequately allege scienter.[13]  *See* Reply at 7.  This is enough to dispose of their claims.  *See Hoffmann v. Kashi Sales, L.L.C.*, 646 F. Supp. 3d 550, 564 (S.D.N.Y. 2022).

Moreover, while not thoroughly discussed in the briefing, it is clear that the Vessel Owners cannot bring intentional misrepresentation claims against GSPL, because the Amended Complaint nowhere alleges that GSPL had any contact with the Vessel Owners.  *See* Reply at 7.  The Amended Complaint does by contrast allege that GSPL had contact with Classic, but in every pertinent instance such contact was made under the contract governing the relationship between these two Parties.  *See, e.g.*, FAC ¶¶ 37 (citing BCNs and BDNs), 55 (citing BDNs), 14–18 (situating BCNs and BDNs in the context of the course of conduct contemplated by the FFP).

This leads to a more fundamental reason to dismiss.  Because any intentional misrepresentations concerned the quality of contracted-for goods, Classic cannot get around that agreement's limits on recovery merely by reframing breach of contract as fraud.  To do so, it would have to "(i) demonstrate a legal duty separate from the duty to perform under the contract . . . (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract . . . or  (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).  Plaintiff

---

[13] The Court's independent review of Plaintiffs' pleadings reveals only wholly conclusory and temporally untethered assertions of fraudulent intent.  *See, e.g.*, FAC ¶¶ 69 ("Glencore intentionally withheld from Plaintiff (and the Singapore government) information about the existence of the COCs, thereby increasing Plaintiffs' damages exponentially every day this information was withheld."), 37 ("Glencore intentionally misrepresented to Plaintiffs that the bunkers would comply with ISO 8217:2017 and MARPOL in the FFP, in each bunker confirmation and in the subsequently issued BDN.")

seems briefly to argue that it has satisfied at least the first two of these three options.  *See* Opp. at 23, 21.  In reality, by its own allegations, it has done neither.

The duty to comply with ISO Standard 8217:2017 and MARPOL Annex VI is not separate from GSPL's duty to perform under the FFP.  FAC ¶ 14 ("The FFP required that the bunkers satisfy certain internationally recognized standards or regulations, including from the International Standards Organization ('ISO') ISO 8217:2017 and The International Convention for the Prevention of Pollution from Ships ('MARPOL') Annex VI").  The argument that "Plaintiffs also alleged that GSPL violated the law of Singapore by selling contaminated fuel . . . [and] fail[ing] to advise Plaintiffs of the contamination," Opp. at 23,[14] changes nothing.  *See Serifos II*, at *2 (The statement "that 'as a bunker supplier, which is licensed and regulated by the Singapore MPA, Glencore owed a duty of care separate and apart from the contract[ ]' . . . is conclusory, providing no authority to support the existence of a legal duty separate and apart from the duty to perform under the contract.").

As described by Plaintiffs, the various extra-contractual laws, regulations, and standards governing transactions in fuel for seafaring vessels,  FAC ¶ 24; *see also* Opp. at 7, 23; [ECF Nos. 23-3, 23-4, 30-1]; 40 C.F.R. § 1043.80; 33 U.S.C. § 1907, "are properly viewed as measures regulating the [fuel supplier's] performance of its contractual obligations, as an adjunct to the contract, not as a legislative imposition of a separate duty of reasonable care."  *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 426 (S.D.N.Y. 2004) (quoting *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 317 (1995)).  This includes the MPA's directive to GSPL to "inform all the ships that were supplied with the fuel to exercise caution when

---

[14] This argument was raised in connection with Plaintiffs' gross negligence claims—Plaintiffs' argument on intentional misrepresentation is limited to a half page, Opp. at 21—but is addressed here because the caselaw Plaintiffs cite discusses intentional misrepresentation claims.  In any event, the Court's analysis here is equally applicable to Plaintiffs' gross negligence claims, which are likewise barred as duplicative of the contract claim.

13

using it[,]" FAC ¶ 43 (quotation omitted).

Nor do alleged misrepresentations in the BCNs and BDNs change the fact that "[t]he claims here all emanate fundamentally from Defendant's alleged breach of the fuel contract between the parties." *Serifos II*, at *2. These, which occurred "after the parties entered into the [FFP]," clearly "did not involve misrepresentations of a present fact . . . that . . . wrongfully induced [Classic] to enter into the contract." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 429 (S.D.N.Y. 2004). Nor are the confirmatory statements in the BCNs and BDNs, which GSPL "was required to make under the contract between the parties . . . collateral or extraneous to [that contract]." *Negrete v. Citibank, N.A.*, 759 F. App'x 42, 48 (2d Cir. 2019) (summary order); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 512 n.21 (S.D.N.Y. 2013) ("If the duty between the parties arose out of a contract, such that the contract required a correct representation, then any misrepresentation must be pled as a breach of contract, not as a tort claim for negligent misrepresentation." (quoting *Madison Capital Co., LLC v. Alasia, LLC*, 615 F.Supp.2d 233, 240 (S.D.N.Y. 2009)).

Amendment would be futile as it could not rewrite the alleged misstatements out of the contractual ambit. Classic's intentional misrepresentation claim is therefore DISMISSED without leave to amend.

## IV.    The Gross Negligence Claim Sounds in Contract, and Plaintiffs Have Not Alleged Gross Negligence

Plaintiffs' gross negligence claim fails as well. To begin with, Plaintiff has not plausibly alleged gross negligence. *See Mindspirit, LLC v. Evalueserve Ltd.*, 2016 WL 11707410, at *10 (S.D.N.Y. Sept. 26, 2016) ("[W]here, as here, the setting is . . . a contract between two sophisticated parties, the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional wrongdoing" in order to constitute actionable gross negligence

(cleaned up, quotations omitted)).

But more fundamentally, as with all of Plaintiffs' tort claims, this claim also sounds in contract.[15]  *Internationale Nederlanden (U.S.) Cap. Corp. v. Bankers Tr. Co.*, 261 A.D.2d 117, 122 (1st Dep't 1999) ("Allegations that a defendant was grossly negligent in failing to perform its contractual duty do not transform a breach of contract action into a tort action." (citing *Clark-Fitzpatrick* at 390)).  For reasons already discussed above, neither Plaintiffs' invocation of various laws, regulations, and standards, Opp. at 23, nor their reference to "potentially catastrophic consequences," Opp. at 23–26, affects this outcome.  Put succinctly, "[t]he harm alleged here does not rise to the level required to transform it from contractual to tortious in nature." *Verizon New York, Inc. v. Optical Commc'ns Grp., Inc.*, 91 A.D.3d 176, 182 (2d Dep't 2011).  Plaintiffs' attempt to recast their gross negligence claim as a claim for "failure to warn," Opp. at 25, or "serial . . . negligence," Opp. at 25–26, is likewise unavailing.[16]  "Any general observation that gross negligence claims may be especially hardy on a motion to dismiss has little application where, as here, the claim is deficient primarily because of a legal principle forbidding duplicate claims." *Serifos I* at \*6.

Amendment would be futile as it could not circumvent the contractual allocations of risk entered into by the Parties or turn the alleged conduct into gross negligence.  Plaintiffs' gross

---

[15] GSPL does not argue that Plaintiffs' gross negligence claim is barred by the economic-loss doctrine, Plaintiffs' subsection tilting at that windmill, Opp. at 26–27, notwithstanding.

[16] It is not clear whether Plaintiffs argument is that negligence premised upon a failure to warn or serial conduct automatically constitutes gross negligence, or just that these forms of negligence uniquely imply the violation of some extracontractual duty such that Plaintiffs tort claims can proceed.  The former argument is clearly wrong. *See Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) ("[A] mistake or a series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence."); *Littlehale v. E. I. du Pont de Nemours & Co.*, 268 F. Supp. 791, 798 (S.D.N.Y. 1966), *aff'd*, 380 F.2d 274 (2d Cir. 1967) (cited by Plaintiffs, Opp. at 25, for the proposition that maritime law includes a duty to warn) (analyzing such claims in terms of ordinary, product-based negligence).  And Plaintiffs supply the Court with no authority for the latter, somewhat confusing, argument.

negligence claims are therefore DISMISSED without leave to amend.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  Plaintiffs may file a further amended complaint solely with regard to breach of contract within three weeks of the date of this Order.  Plaintiffs will not thereafter be granted another opportunity to amend.

The Clerk of Court is respectfully requested to terminate docket entry number 22.

**SO ORDERED.**

**Date:  February 10, 2026**
　　　　**New York, NY**

　　　　　　　　　　　　　　　　　　　　　　　**MARY KAY VYSKOCIL**
　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**

16